Betty WINKELMAN, Plaintiff-Respondent-Cross Appellant,

v.

BELOIT MEMORIAL HOSPITAL, Defendant-Appellant-Cross Respondent.

Supreme Court

*No. 90-0541. Oral argument January 23, 1992.—Decided May 6, 1992.*

(Also reported in 483 N.W.2d 211.)

For the defendant-appellant-cross respondent, there were briefs by *Jere W. Wiedenman, David Lucey* and *Foley & Lardner,* Milwaukee and oral argument by *Mr. Lucey.*

For the plaintiff-respondent-cross appellant, there were briefs by *Richard R. Grant* and *Consigny, Andrews, Hemming & Grant, S.C.,* Janesville and oral argument by *Richard R. Grant.*

HEFFERNAN, CHIEF JUSTICE. This is an appeal by Beloit Memorial Hospital from a judgment of the circuit court for Rock county, Edwin C. Dahlberg, Circuit Judge, which adjudged that the hospital wrongfully discharged Betty Winkelman, and also a cross appeal by Betty Winkelman from the part of the judgment dismissing her claims based upon contract. The appeals were accepted upon the certification of the Court of Appeals. We affirm the circuit court.

The specific issue certified by the court of appeals is whether the cause of action for wrongful discharge established in *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 335 N.W.2d 834 (1983) based upon public policy may be grounded upon an administrative rule. We conclude that in this case it may. Where a fundamental and well-defined public policy is evidenced by an administra-

tive rule, a discharge for an employee's refusal to violate that public policy is actionable. In addition, we hold that attorney's fees are unavailable in a wrongful discharge cause of action.

Betty Winkelman graduated from nursing school in 1947, obtained a bachelor's degree in nursing from Boston University in 1953 and earned a master's degree in nursing service administration from the University of Chicago in 1956. She worked as a maternity nurse and clinical instructor in several hospitals from 1956 to 1958, and then left nursing for 13 years in order to raise her family. From 1971 to 1987, Beloit Memorial Hospital employed Winkelman as a part-time nurse. During this time, Winkelman worked only on weekends and exclusively in the nursery.

Prior to October, 1987, the hospital maintained an unofficial policy of requiring maternity nurses who were not needed in the maternity ward to "float" to other parts of the hospital where nursing help was needed. According to the testimony at trial, floating involves moving to another part of the hospital and assisting with whatever nursing duties are required. During this period, Winkelman did not float. Winkelman testified that at the time of her hiring in 1971 she informed the hospital that she wanted to work only in the nursery, and that the hospital agreed to that arrangement. According to Winkelman's testimony, "it was known" that she would not float.

On October 29, 1987, the hospital promulgated specific guidelines for floating from the maternity ward. The guidelines required all nurses in the ward to float when not needed in the maternity ward, and instructed that "[t]he responsibilities of floating will be to do nursing care on a PRN basis, not in a team leading capac-

16

ity."[1] Pursuant to these guidelines, the maternity nurses developed a rotation book to keep track of whose turn it was to accept a float assignment.

On November 24, 1987, Winkelman arrived at the hospital and learned that the maternity ward was over-staffed. Because of a need in another part of the hospital, the maternity nurses were told that one of them would have to float to "3-Center," an area of the hospital involving post-operative and geriatric care. The rotation book indicated that it was Winkelman's turn to float. Winkelman said that she did not think she was qualified to float, and that she would go talk to the supervisor about it. Winkelman then discovered that a new supervisor, Sandra Linebarger, had started work that morning.

The evidence regarding Winkelman's meeting with Linebarger is conflicting. Winkelman testified that she told Linebarger that she had never floated, that she was exclusively a nursery nurse, that she was unqualified to float to 3-Center and that floating would put the patients at risk, her license at risk, and the hospital in jeopardy. According to Winkelman, Linebarger gave her three options: float, find another nurse to float in her place, or take an unexcused absence day and go home. Linebarger testified that she offered Winkelman only two

---

[1]PRN, from the latin pro re nata, literally means "for the occasion as it may arise." Black's Law Dictionary 1099 (5th ed. 1979). A PRN nurse performs ancillary duties as needed for the assigned registered nurse, similar to the duties of a licensed practical nurse or a nursing assistant. Such duties include answering call lights, emptying bedpans, ambulating patients, passing routine medications and providing other routine care for patients. A team leader, on the other hand, is responsible for the total nursing care of the patients on his or her assigned team and is responsible for the direction and supervision of all team personnel.

options—float or find a replacement. Winkelman went home.

The hospital sent Winkelman a letter telling her that it construed her actions as a voluntary resignation of her employment at the hospital. Winkelman denied that she had resigned and requested reinstatement. The hospital refused.

In November, 1988, Winkelman filed a complaint against Linebarger with the state Board of Nursing. Winkelman alleged that Linebarger violated Board of Nursing rules by assigning her to float to 3-Center.[2] The Board of Nursing assigned a regulation compliance investigator and an attorney to investigate the complaint. The extent of this investigation is unclear, but it is clear that neither Winkelman nor her co-workers were interviewed. Representatives of the Division of Enforcement presented the results of the investigation to the Board of Nursing and on January 19, 1989, the Board voted to close the case because it found no violation of any statute or rule.

On December 22, 1988, Winkelman filed a complaint for wrongful discharge and breach of contract against the hospital. The complaint alleged that the hospital's actions constituted a wrongful discharge of Winkelman "contrary to a fundamental and well-defined public policy . . .." The alleged public policy violated by

---

[2]Winkelman alleged that Linebarger violated Wis. Admin. Code sec. N 6.03(3)(a), which provides: "In the supervision and direction of delegated nursing acts an R.N. shall . . . [d]elegate tasks commensurate with educational preparation and demonstrated abilities of the person supervised," and also Wis. Admin. Code sec. N 7.03(1)(e), which defines "negligence" to include "[e]xecuting an order which the registrant or licensee knew or should have known would harm or present the likelihood of harm to a patient."

the hospital is stated in Wis. Admin. Code sec. N 7.03(1)(g), which provides that "negligence" as used in sec. 441.07(1)(c), Stats., includes: "[o]ffering or performing services as a licensed practical nurse or registered nurse for which the licensee or registrant is not qualified by education, training or experience."[3] Section 441.07(1)(c), Stats., provides that the Board of Nursing may revoke, limit, suspend or deny renewal of a nurse's license for acts constituting negligence. Winkelman also claimed that the hospital violated its own disciplinary policy and breached a specific promise to Winkelman that she would work in the nursery only.

The circuit court dismissed Winkelman's breach of contract claims prior to submitting the case to the jury, but allowed the wrongful discharge action to go to the jury. The judge instructed the jury as follows:

> In Wisconsin, an employer may discharge an employee for a good reason, for no reason, or even for a reason that is morally wrong, without committing a legal wrong. One exception to this rule is where an employee is discharged for refusing an employer's command to do something that would itself violate a well-established and important public policy. Public policy in Wisconsin declares that a Registered Nurse shall not perform services for which he or she is not qualified by education, training or experience. If you find that the plaintiff did not quit her job, then you must consider whether this "public policy exception" applies to the case.

[3]The original complaint referred to Wis. Admin. Code sec. N 6 as the source of the public policy violated, but at trial the policy was identified as Wis. Admin. Code sec. N 7.03(1)(g). The hospital did not object to this change.

The plaintiff claims that she was fired because she refused to perform nursing services on 3 Center for which she claims she was not qualified.

The jury found that Winkelman was wrongfully discharged by the hospital, and awarded her $39,344 in lost earnings. The circuit court denied Winkelman's post-verdict motion for attorney's fees.

The hospital appeals the judgment of wrongful discharge on two grounds. First, the hospital contends that an administrative rule cannot supply a public policy to support a wrongful discharge action—that only a statutory or constitutional provision will suffice. Second, the hospital argues that even if Winkelman alleged a public policy, the evidence produced at trial was insufficient to support the jury's determination that it was violated. Winkelman cross appeals the circuit court's denial of her motion for attorney's fees.[4] We consider each of these arguments in turn.

Under the employment-at-will doctrine, either the employer or the employee may terminate the employment relationship " 'for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong.' " *Brockmeyer,* 113 Wis. 2d at 567. In *Brockmeyer,* this court recognized a limited exception to the employment-at-will doctrine "when the discharge is contrary to a fundamental and well-defined public policy

---

[4]Winkelman also cross appeals the circuit court's dismissal of her breach of contract claims, arguing that the hospital's disciplinary policy created an other than at-will contract under *Ferraro v. Koelsch,* 124 Wis. 2d 154, 368 N.W.2d 666 (1985), and that the hospital breached a specific promise that Winkelman would work in the nursery only. Because we conclude that Winkelman successfully proved that she was wrongfully discharged, we do not address these claims.

as evidenced by existing law." *Id.* at 573. We further explained the concept of public policy:

> Given the vagueness of the concept of public policy, it is necessary that we be more precise about the contours of the public policy exception. A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end.

*Id.* Later cases established that the wrongful discharge cause of action encompasses public policy embodied in the spirit as well as the letter of statutory and constitutional provisions. *Wandry v. Bull's Eye Credit Union,* 129 Wis. 2d 37, 49, 384 N.W.2d 325 (1986), *Bushko v. Miller Brewing Co.,* 134 Wis. 2d 136, 143, 396 N.W.2d 167 (1986), *Schultz v. Production Stamping,* 148 Wis. 2d 17, 22, 434 N.W.2d 780 (1989).

The question presented by this case is whether the wrongful discharge cause of action should embrace public policy evidenced by an administrative rule. In this case, the public policy identified by the circuit court and presented to the jury was derived from Wis. Admin. Code sec. N 7.03(1)(g). The circuit court instructed the jury that "[p]ublic policy in Wisconsin declares that a Registered Nurse shall not perform services for which he or she is not qualified by education, training or experience." The hospital argues that our previous cases require that the public policy be evidenced only by a statutory or constitutional provision. Winkelman responds that because administrative rules have the full force of statutes they are proper sources of public policy,

or in the alternative that sec. N 7.03(1)(g) merely represents the spirit of sec. 441.07, Stats.

We hold that where a fundamental and well-defined public policy is evidenced by an administrative rule, a discharge for refusal to violate that public policy is actionable. The guiding principle of *Brockmeyer* is not a slavish adherence to the arbitrary requirement that the public policy be evidenced by a statutory or constitutional procedure; rather, it is that an employer must not be allowed to discharge an employee for the employee's refusal to violate a formally stated, fundamental and well-defined public policy which has the effect of law. Heretofore we have required that the public policy be evidenced by a statutory or constitutional provision as a means to protect the public from frivolous lawsuits by allowing the circuit court to screen cases on motions to dismiss or motions for summary judgment. *Brockmeyer,* 113 Wis. 2d at 574. The facts of this case make clear that public policy that is fundamental and important may be enunciated in administrative rules and that to use such rules will not frustrate this type of screening. An administrative rule, as well as a statutory or constitutional provision, may contain a clear expression of public policy.

It is not argued, nor could it be, that administrative rules may not state fundamental and important public policy. Section 227.01(13), Stats., defines an administrative rule as follows:

> "Rule" means a regulation, standard, *statement of policy* or general order of general application *which has the effect of law* and which is issued by an agency to implement, interpret or make specific legislation enforced or administered by the agency or to govern

22

the organization or procedure of the agency. . . . [Emphasis added.]

In *Liberty Homes, Inc. v. DIHLR,* 136 Wis. 2d 368, 401 N.W.2d 805 (1987), we noted that "agency rules have the full force and effect of legislative enactments," and that agencies serve "policy making functions." *Id.* at 383, 388. We held that on judicial review of administrative rules, courts must carefully examine the facts supporting a particular rule, but must give due deference to an agency's expertise. Explaining the reason for this holding, we stated:

> It allows proper deference to the agency to whom the legislature has delegated authority for policymaking, thereby preserving the role of the agency as decisionmaker in policy areas where it possesses comparatively more technical and scientific expertise than the courts.

*Id.* at 389. Certainly nursing represents an area where the legislature delegated its policymaking authority to the Board of Nursing because the board has significantly more technical and scientific expertise than either the legislature or the courts and is better able to determine when, because of a failure to observe standards, a nurse's actions constitute negligence. Public policy represented by administrative rules enacted by agencies pursuant to legislative direction is no less fundamental or well-defined merely because it is to be found not in a statute but in the administrative code. In this case the public policy represented by the administrative rule is more clearly and well-defined than the public policy of the statute it interprets. While sec. 441.07, Stats., indicates that the Board of Nursing should discipline negligent nurses, Wis. Admin. Code sec. N 7.03(1) explains in some detail what types of conduct constitute negligence.

23

We however do not hold that all administrative rules implicate fundamental public policy. Neither do all statutes. Rather, it is the content of either a rule or statute that determines whether a fundamental public policy is stated.

Having determined that an administrative rule may evidence public policy the violation of which can support a wrongful discharge action, we must determine whether Winkelman stated a claim for wrongful discharge. In *Brockmeyer,* we explained that the plaintiff-employee must first identify a fundamental and well-defined public policy, and then must prove that the discharge violated that policy. 113 Wis. 2d at 574. The burden then shifts to the employer to prove that the discharge was for just cause. *Id.*

Whether the plaintiff has identified a fundamental and well-defined public policy is an question of law for the trial court. *Brockmeyer,* 113 Wis. 2d at 574. This court reviews questions of law without deference to the decision of the trial court. *Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). Winkelman has identified in the administrative code a fundamental and well-defined public policy that a nurse should not offer or perform services for which he or she "is not qualified by education, training or experience." Wis. Admin. Code sec. N 7.03(1)(g).

The hospital does not contend that this policy is not fundamental and well-defined, but merely asserts that it is found in neither a statutory nor constitutional provision. In a sense, however, this specific statement of public policy is merely an elaboration of the broad public policy of sec. 441.07, Stats., which empowers the Board of Nursing to revoke, limit, suspend or deny renewal of a

24

license of a registered nurse for a variety of acts, including "[a]cts which show the registered nurse . . . to be . . . incompetent by reason of negligence . . .." The public policy behind sec. 441.07, Stats., is that patients should be protected from negligent nurses. Section N 7.03(1) expands and explains this public policy by defining particular forms of negligence—in this case, offering or performing services for which the nurse is unqualified. There hardly could be a more fundamental policy than this, that the sick should be given care only by those who are in fact qualified to do so—that licensure does not in itself confer a particular qualification.[5] The latter often can be achieved only by special training and experience.

The hospital argues that as a matter of law, Winkelman's evidence was insufficient to prove that the discharge violated this public policy. The hospital contends that it never commanded Winkelman to perform any services, because its floating policy only required the floating nurse to perform services for which he or she was qualified, and because Linebarger offered Winkelman the option of finding another nurse to float in her place. This argument is inappropriate and comes too late because the question of whether a discharge violates a fundamental and well-defined public policy is a question of fact for the jury. The jury, properly instructed, in this case specifically found that Winkelman was wrongfully discharged. Implicit in the jury's verdict is the finding that the hospital commanded Winkelman to offer or provide service for which she was unqualified. This court

[5]It should be noted that sec. 441.115, Stats., provides exceptions for nursing by family members, friends, undergraduates in an accredited school and religious communities, where there is no representation that the person engaged in the activity is a registered nurse.

will overturn a jury finding only where there is no credible evidence to support it. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305–06, 347 N.W.2d 595 (1984). The evidentiary record amply supports the jury's finding that Winkelman was wrongfully discharged.

The hospital's argument that its floating policy did not require Winkelman to offer or perform services for which she was unqualified was contradicted by testimony at trial that Winkelman's 40-year history of nursery-only work made her unqualified for even the simplest tasks in 3-Center. Additionally, Winkelman introduced into evidence the March, 1988 Board of Nursing's Regulatory Digest, which specifically provided:

> According to s. N 7.03(1)(g), Wis. Adm. Code, a nurse may be found negligent and may be disciplined by the board for "offering or performing services as a licensed practical nurse or registered nurse for which the licensee or registrant is not qualified by education, training or experience." A nurse is not necessarily qualified or competent to practice in any area of nursing simply because the nurse has graduated from a school of nursing and has passed the licensure exam. Therefore, employers and nurses themselves are accountable for determining competence to practice in a particular area of specialty. *If a particular area is not a nurse's major area of employment, the nurse has a right to refuse assignment to the questionable area.* If an employer wants a nurse to rotate to an area that is not the nurse's usual area of assignment, then the employer should provide for the nurse's further education and training to prepare the nurse to work in the area. [Emphasis added.]

The hospital's defense that Winkelman's option to find a replacement precludes a finding that she was commanded to violate public policy is contrary to the evi-

dence. The evidence showed that Winkelman was not professionally trained or qualified to select a nurse to float to another unit and to perform in a qualified manner. Ellen Murphy, a Professor of Nursing at the University of Wisconsin-Milwaukee and the only expert witness at trial, testified that it would likely have been negligent for Winkelman to select a nurse to float to 3-Center. Winkelman produced sufficient evidence to prove that her discharge was because of her refusal to violate the fundamental public policy that only qualified nurses are to render services.[6]

The hospital did not attempt to show that the discharge was for just cause. Its only affirmative defense at trial was that Winkelman voluntarily resigned, and thus that there was no discharge. The jury however unanimously found that Winkelman did not voluntarily terminate her employment, and the hospital does not contest this finding on appeal. We accordingly affirm the circuit court's judgment that Winkelman was wrongfully discharged.

Winkelman cross appeals from the circuit court's denial of her motion for attorney's fees. Winkelman argues that because *Brockmeyer* prescribed a "make whole" remedy for wrongful discharge actions, an award

[6]The hospital argues that the Board of Nursing's finding that Sandra Linebarger violated no statute or rule should have been binding on the trial court. This argument is without merit because the complaint against Linebarger involved different provisions of the administrative code than the provision at issue here, and because the board's investigation was apparently limited to asking Janet Blair, the Vice President of Human Resources at the hospital, whether a violation occurred. The board did not interview or examine Winkelman, Linebarger or any other nurses.

of attorney's fees is required to make the plaintiff truly whole. Winkelman asserts that the reasoning of *Watkins v. LIRC,* 117 Wis. 2d 753, 345 N.W.2d 482 (1984), where this court held that plaintiffs under the Wisconsin Fair Employment Act (WFEA), secs. 111.31–111.395, Stats., are entitled to attorney's fees, is applicable to this case. We do not find the provisions analogous.

Wisconsin adheres to the "American rule" concerning attorney's fees, under which the prevailing litigant is generally not entitled to collect attorney's fees from the opposing party as damages or costs. *Fehring,* 118 Wis. 2d at 315–16; *Watkins,* 117 Wis. 2d at 758; *Kohlenberg v. American Plumbing Supply Co.,* 82 Wis. 2d 384, 399–400, 263 N.W.2d 496 (1978). Attorney's fees are recoverable only where such fees are authorized by statute or contract, or where they are the natural and proximate result of a wrongful act by the defendant which subjects the plaintiff to litigation with a party other than the defendant. *Kohlenberg,* 82 Wis. 2d at 399. None of those situations are present here. A wrongful discharge cause of action derives from common law principles, not the statutes. While the public policy upon which the action is based may derive from a statute or, as in this case, an administrative rule, neither the statute nor the administrative rule involved in this action authorizes an award of attorney's fees. There is no evidence of any contractual authorization of attorney's fees, nor was Winkelman forced to litigate with any third party.

Winkelman's analogy to *Watkins* is not persuasive. In *Watkins,* this court allowed DILHR to award attorney's fees in WFEA cases to further the design of the WFEA to "discourage discriminatory practices in the work place and to make whole anyone discriminated against." 117 Wis. 2d at 755. The court specifically noted

that DILHR's power to award attorney's fees was implied from its statutory power to "order such action . . . as will effectuate the purpose of this subchapter." Section 111.36(3)(b), Stats. 1975 (currently sec. 111.39(4)(c), Stats.). Thus *Watkins* held only that DILHR's power to award attorney's fees is implied from its broad authority under the WFEA, and does not stand for the proposition that a successful plaintiff must be awarded attorney's fees to be "made whole." This rationale precludes attorney's fees in a wrongful discharge action.

In conclusion we reiterate that the administrative code based upon the statutes clearly established that it is contrary to fundamental public policy for a nurse to volunteer to perform nursing services for which the nurse is not qualified, and that it is contrary to that policy to direct a nurse to perform services for which the nurse does not have the necessary qualifications. Because the plaintiff Winkelman was, as the jury found, discharged for her refusal to violate that fundamental policy, we affirm the judgment of the circuit court in that respect. We also affirm that part of the judgment that denied the plaintiff attorney's fees.

*By the Court.*—Judgment affirmed.

STEINMETZ, J. *(dissenting).* This court has consistently applied Wisconsin's public policy exception to the employment at will doctrine in a narrow manner. The exception is limited to public policy as declared in the state's constitution or statutes. I disagree with the majority's application of the exception to this case and therefore dissent.

It is important to first review the historical development of Wisconsin's public policy exception to the

employment at will doctrine. Starting with *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 573-74, 335 N.W.2d 834 (1983), this court adopted a narrow exception and outlined how the exception shall apply to wrongful discharge cases.[1] We stated that: "A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest." We continued by stating: "An employer may not require an employee to violate a constitutional or statutory provision with impunity," and, "[i]f an employee refuses to act in an unlawful manner, the employer would be violating public policy by terminating the employee for such behavior." *Id.*

Public policy rules such as the one adopted in *Brockmeyer,* attempt to balance the interests of the public, the employer and the employee. *Id.* Recognizing that the concept of public policy is a vague concept, we advised in *Brockmeyer* that courts make public policy determinations with caution. *Id.* In addition, we stressed several times that public policy only means policy established by constitutional or statutory provisions. *Id.* at 573, 577, 578, and 579.

In *Wandry v. Bull's Eye Credit Union,* 129 Wis. 2d 37, 384 N.W.2d 325 (1986), this court added a new element to the exception outlined in *Brockmeyer.* This court recognized in *Wandry* that a court must not only look to the literal language of a statute or constitutional provision, but also the spirit of the law or provision. *Id.* at 45-47. We concluded that "public policy . . . need not be expressed in a statute protecting an employee from

---

[1] For an overview of the development of the employment at will doctrine from the English common law through its development in the American court system up to 1983, *see Brockmeyer,* 113 Wis. 2d at 566-67.

discharge" and continued in stating, "[t]he legislature 'has not and cannot cover every type of wrongful termination that violates a clear mandate of public policy.' " *Id.* at 42. The majority held that although the language of the statute at issue did not cover the factual circumstances of the case, nevertheless, the spirit of the provision was relevant and supplied the statutory public policy for protecting the plaintiff's employment.[2]

The most recent decision from this court concerning Wisconsin's exception to the employment at will doctrine is *Bushko v. Miller Brewing Co.,* 134 Wis. 2d 136, 396 N.W.2d 167 (1986). In *Bushko,* we reiterated the public policy exception articulated in *Brockmeyer* and acknowledged the exception's limitation to policy established by constitutional or statutory provisions by stating: "It is only these two areas of public policy that can be a basis for the exception." *Id.* at 146. Thus, this court has made it clear that the public policy exception is a very narrow exception and must be applied only to employees ordered to act contrary to a constitutional or statutory provision.

The issue certified to this court is whether a *Brockmeyer* public policy claim can be maintained when an administrative rule, rather than a constitutional or statutory provision, is involved. The majority concludes that "where a fundamental and well-defined public policy is evidenced by an administrative rule, a discharge

[2]The petitioner in *Wandry* was fired for refusing an order to pay the employer for a bad check. Public policy arguments were based on the interpretation of sec. 103.455, Stats. Although I agreed with this court's process of applying the spirit of the law in *Wandry,* I disagreed with the majority's construction of the statute's purpose and its application to the relevant facts. I therefore wrote a dissenting opinion in the case, *see Wandry,* 129 Wis. 2d at 49–56.

for refusal to violate that public policy is actionable." Majority op. at 22. I disagree. Although administrative regulations are said to have the force of law,[3] they remain a form of law subordinate to both the constitution and statutes.[4] Because an administrative regulation is not the equivalent of a constitutional or statutory provision, the exception to the employment at will doctrine should not apply to the case at bar.

Under sec. 441.07(1)(c), Stats., one basis the board of nursing has for reprimanding a nurse is when the board concludes that the individual is "unfit or incompetent by reason of negligence."[5] The board issued an interpretive regulation that says negligence within the

---

[3] " 'Rules, regulations, and general orders enacted by administrative agencies pursuant to the powers delegated to them have the force and effect of law.' " *Josam Mfg. Co. v. State Board of Health,* 26 Wis. 2d 587, 596, 133 N.W.2d 301 (1965).

[4] An administrative regulation must be consistent with the constitution and also authorized by the statute creating the agency. It must fit within the framework of the statute creating the agency and the rule must also be in accord with the statutory policy. *Josam Mfg.,* 26 Wis. 2d 587. Furthermore, because the legislative body is the source of an agency's power, "the provisions of the statute will prevail in any case of conflict between a statute and an agency regulation." 1A Sutherland Stat. Const. sec. 31.02 (4th Ed 1985). *See generally* Stein, Mitchell, Mezines, 3 Administrative Law sec. 13.01 (1990). Finally, despite the duration, an administrative rule may not stand at variance with an unambiguous statute. *Basic Products Corp. v. Department of Taxation,* 19 Wis. 2d 183, 120 N.W.2d 161 (1963). *See also Plain v. Harder,* 268 Wis. 507, 68 N.W.2d 47 (1955) (a rule out of harmony with a statute is a mere nullity).

[5] The board of nursing may reprimand a nurse if it concludes that the individual has committed one of the following:

(a) Fraud in the procuring or renewal of the certificate or license.

statute means, among other things, "offering or performing services as a . . . nurse . . . for which the licensee is not qualified by education, training or experience." Wis. Admin. Code sec. N 7.03(g) (Board of Nursing) (May 1990). This interpretive regulation is what the majority relies on to fit the present case within the narrow confines of the *Brockmeyer* exception.

The board has authority to issue interpretive regulations but interpretive regulations are not binding on courts. Rather, they are simply the board's opinion about the law.[6] Furthermore, such provisions are not considered substantive law having the force and effect of statutes. *See* L. Modjeska, Administrative Law Practice And Procedure, sec. 1.8 (1985). Thus, the regulation that the majority relies on does not fit within the *Brockmeyer* framework because it is not policy established by a constitutional or statutory provision.

The conflict between Winkelman and the hospital is, in essence, a difference in professional judgment. The hospital, on the one hand, is dealing with the problem of

> (b) One or more violations of this chapter or any rule adopted by the board under the authority of this chapter.
>
> (c) Acts which show the registered nurse, nurse-midwife or licensed practical nurse to be *unfit or incompetent by reason of negligence,* abuse of alcohol or other drugs or mental incompetency.
>
> (d) Misconduct or unprofessional conduct.

*See* sec. 441.07(1), Stats. (emphasis added).

[6]One authority states: "Interpretative rules represent an agency's interpretation of statutes or regulations. Interpretative rules do not have the force of law, and are not binding, but rather are in the nature of legal advice, albeit generally good legal advice." (citations omitted) L. Modjeska, Administrative Law Practice & Procedure, sec. 1.8 at p. 15 (1982). It is also conceded that courts do give consideration to the interpretation of a statute by its enforcing administrative agency. *Northwestern Insulation v. LIRC,* 147 Wis. 2d 72, 432 N.W.2d 620 (Ct. App. 1988).

trying to control health care costs by using its work force in a flexible manner and at the same time guaranteeing a basic level of quality care to its patients. Winkelman on the other hand, disagrees with the hospital's judgment and contends that she is not capable of working in another unit of the hospital. Interestingly, she alone refused to go to other hospital units; the other obstetrics nurses were willing to render their assistance in other units. It seems odd that Winkelman would feel unqualified to perform even menial tasks in another unit, particularly since she was no stranger to the medical field. In fact, Winkelman has a masters degree, teaching experience and several years of nursing experience.

The obstetrics nurse who accepted the assignment in place of Winkelman testified that she was at the assigned unit about half of a day.[7] There were things she felt uncomfortable doing and merely refused to do them; however, she was not disciplined in any way for not doing the work she was uncomfortable with. Even Winkelman testified that she understood it was the policy of the hospital that she should not do anything that exceeded her qualifications. There is simply no evidence in this record to support a conclusion that Beloit Memorial Hospital ordered Winkelman to do something that she was not qualified to do.

The essence of an employment relationship is that an employer specifies reasonable rules and the employee performs within the rules. The majority opinion allows a professional employee, such as Winkelman, to exercise a veto power over the professional judgments of an employer. Such a result is far beyond what we stated the

---

[7]The unit that Winkelman was asked to report to was a medical unit in which several geriatric patients were being treated.

law to be in *Brockmeyer.*[8]

I also disagree with the outcome of this case because of the improper verdict question posed to the jury. Despite the fact that both parties stipulated it was for the court to decide as a matter of law whether the nursing board regulations prohibited Winkelman from being temporarily reassigned to a different unit, the trial judge submitted the question to the jury to determine the meaning of the regulation. The issue was a legal question which the judge should have determined as a matter of law.

The trial judge was also in error because the nursing board's decision, which reflected an interpretation of the nursing regulations, was not followed or given great deference. The majority acknowledges the board's expertise when it states that the board of nursing "has significantly more technical and scientific expertise than either the legislature or the courts and is better able to determine when, because of a failure to observe standards, a nurse's actions constitute negligence." Majority op. at 23. When the board reviewed the facts of this case, it concluded that a hospital has the authority to assign a nurse to a position where the nurse is not familiar with all the tasks called on to perform. This decision is entitled to great deference. *Castle Corp. v. Rev. Dept.,* 142 Wis. 2d 716, 719, 419 N.W.2d 709 (Ct. App. 1987).

Due to the fact that Winkelman failed to invoke constitutional or statutory provisions in support of her public policy discharge claim, and because no evidence

---

[8]We stated in *Ferraro v. Koelsch,* 124 Wis. 2d 154, 165, 368 N.W.2d 666 (1985):

All employees could have been dischargeable at the whim of the employer, subject to the unusual public policy considerations that may occasionally arise and which were explained in *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 335 N.W.2d 834 (1983).

exists in this record to support a conclusion that Beloit Memorial Hospital ordered Winkelman to perform tasks that she was not qualified to do, the trial court's decision should be reversed. Based on the aforementioned reasons, I dissent.