Mary Kate REILLY, Plaintiff-Appellant,†

v.

WAUKESHA COUNTY, William Weber and Steven Turner,
Defendants-Respondents.

Court of Appeals

*No. 94–1493. Submitted on briefs March 1, 1995.—Decided
April 18, 1995.*

(Also reported in 535 N.W.2d 51.)

†Petition to review denied.

529

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Paul F. Reilly* of *Hippenmeyer, Reilly & Moodie, S.C.*, of Waukesha.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Jeffrey Wm. Bartelt* of *Hunter & Sommers*, of Waukesha.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

FINE, J.   Mary Kate Reilly appeals from a judgment dismissing her wrongful-discharge action. The issue presented is whether, under the public-policy exception to an employer's right to fire an at-will employee, an employer may fire an employee for refusing to comply with a superior's illegal order when the employer could reasonably conclude that the employee's refusal to comply with that order jeopardized significant lawful interests of either the employer or of the public. We conclude that the answer to this question is "yes," and affirm. Despite the somewhat convoluted procedural posture of this case, we also conclude that the trial court properly considered the merits of Reilly's wrongful discharge claim.

## I.

Reilly's wrongful-discharge claim was originally asserted in a complaint filed in August of 1990, and which alleged the following: Until her discharge, Reilly was a child-care worker employed by Waukesha County at the Waukesha County Children's Center. When Reilly reported for work on December 17, 1989, she was told that she would have "to work both the female secure detention unit and female shelter care unit" for the third shift because she was the "only female staff member working" those units for that

530

shift. This direction violated WIS. ADM. CODE § HSS 346.08(5)(b)(3), which, as applicable to this case, provided: "No staff member responsible for supervision of juveniles in a secure detention living unit may during the same time period have responsibility for the supervision of juveniles in a non-secure unit."[1] Reilly asked her supervisor, Stephen Turner, for written confirmation of the direction, as well as a "statement indemnifying [her] from any liability created by the County's violation of the State mandated staffing requirements." Turner refused, and told Reilly that she would either have to comply with his direction or leave. William Weber, the Coordinator for the Waukesha County Children's Center, called Reilly on December 19, 1989, and told her that she was being fired for " 'insubordination.' "

The defendants answered the complaint, and moved for summary judgment, arguing that Reilly's failure to allège that her dismissal "was a result of her failure to violate an established constitutional or statutory mandate as required" by *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983),

---

[1] In April of 1990, provisions governing detention facilities for juveniles were transferred to WIS. ADM. CODE Chapter DOC 346. Significantly, in 1992, WIS. ADM. CODE § DOC 346.08(5)(b) (3) was repealed. ORDER OF DEPARTMENT OF CORRECTIONS PROMULGATING CLEARINGHOUSE RULE 91-184 (DOC 346), at 10; *see also id.* at 4 ("The current provision prohibiting a staff member responsible for the supervision of juveniles in a secure detention facility from concurrently supervising juveniles in a non-secure facility has been deleted."). The only comparable provision is now WIS. ADM. CODE § DOC 346.33(5)(b)(1), which applies only to secure detention facilities, *see* WIS. ADM. CODE § DOC 346.01, and which requires that "[t]here shall be at least one security staff member on duty at all times in each living area where juveniles are present."

was fatal to her claim. Before the trial court could rule on the defendants' summary-judgment motion, Reilly amended her complaint to, *inter alia*, assert a civil-rights claim under 42 U.S.C. § 1983. The § 1983 claim alleged that Reilly's dismissal violated her free-speech rights under the First Amendment. The amended complaint also added an averment that admitted that Reilly "did not supervise the secure detention unit," as she had been instructed to do.

The trial court granted the defendants' motion for summary judgment on the wrongful-discharge claim, but did not address Reilly's 42 U.S.C. § 1983 claim. Approximately one month after entry of the trial court's order dismissing Reilly's wrongful-discharge claim, the defendants removed the case to federal court. *See* 28 U.S.C. § 1441(a) (removal to federal court from state court of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction"). Reilly asked the district court to reconsider the state trial court's dismissal of her wrongful-discharge claim, but the district court denied her motion. Additionally, Waukesha County was dismissed from the action on the ground that there was no evidence that the county had a policy of depriving its employees of their free-speech rights. *See Reilly v. Waukesha County, Wisconsin,* 993 F.2d 1284, 1286 (7th Cir. 1993). A jury found for the individual defendants. *Ibid.* Reilly appealed from the jury verdict, and the United States court of appeals affirmed. *Ibid.*

Subsequent to the removal of Reilly's case to federal court, but prior to the decision of the federal appeals court affirming the dismissal of the 42 U.S.C. § 1983 claim against Turner and Weber, the Wisconsin Supreme Court revisited the issue of how much leeway employers had in dismissing at-will employees, and

expanded the reach of *Brockmeyer* to encompass public-policy interests that were reified in administrative rules as well as in constitutional or statutory provisions. *Winkelman v. Beloit Memorial Hospital*, 168 Wis. 2d 12, 483 N.W.2d 211 (1992). The federal appeals court noted that although it had the discretionary authority to review the dismissal of Reilly's wrongful-discharge claim by the state trial court, because that interlocutory ruling merged into the judgment of the federal district court, it might be more appropriate for the state courts to apply *Winkelman* to the particular facts of this case. *Reilly*, 993 F.2d at 1287. *Reilly* vacated the district-court judgment on the state claim, and remanded the case to the district court "with instructions to consider the effect of *Winkelman* or to remand the state claim to state court." *Id.*, 993 F.2d at 1288. The district court remanded the state claim to state court.

## II.

Although the trial court believed that the federal appeals court did not have authority to vacate the order dismissing Reilly's wrongful-discharge claim, it addressed on the merits Reilly's contention that summary judgment for the defendants was improper under the standards established in *Winkelman*. We conclude that *Winkelman*'s impact on the issues in this case was properly before the trial court, and that its grant of summary judgment to the defendants must be affirmed.

A. *Trial court's power to decide case after remand.*

The trial court concluded that Reilly's wrongful-discharge claim was not properly before it because: 1) the federal appeals court "was without authority to vacate this court's dismissal"; 2) on remand from the federal district court, the case "picks up" where "it left off when the case was removed"; and 3) Reilly neither sought reconsideration from the trial court nor appealed the order of dismissal to the court of appeals. We disagree.

Whether the trial court had competency to decide *Winkelman*'s impact on Reilly's wrongful-discharge claim after remand from the federal district court is a question of law that we review *de novo. See Village of Shorewood v. Steinberg*, 174 Wis. 2d 191, 200, 496 N.W.2d 57, 60 (1993). As the federal appeals court pointed out in *Reilly*, a final judgment entered by a United States district court in a case that has been removed to federal court encompasses all interlocutory rulings in the case, including rulings by the state trial court prior to removal, *Duncan v. Gegan*, 101 U.S. 810, 812 (1880), and the party on the losing side of a state-court interlocutory ruling has the right to federal appellate review of that ruling, *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir. 1991). *Reilly*, 993 F.2d at 1287. Appellate review, of course, includes the power to vacate any order or judgment properly before the appellate court. *See* 28 U.S.C. § 2106 (Any "court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review."). Inasmuch as the state trial court's order granting summary judgment to the defendants on Reilly's wrongful-discharge claim was properly before the federal appeals court, it had the power to vacate that dismissal. The federal

534

courts also had the power to remand to the state courts the state claim. *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 348–357 (1988). The trial court here had competency to entertain defendants' motion for summary judgment on remand from the federal courts.

B. *Reilly's employment rights as an at-will employee.*

As we have seen, the trial court granted summary judgment to the defendants. As with the first issue, our review here is *de novo* as well. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). The material facts in the summary-judgment record are undisputed. Indeed, the only evidentiary material was submitted by Reilly, and it is mostly excerpts from the testimony in the federal-court trial of Reilly's 42 U.S.C. § 1983 claim.

Reilly does not contest that she was an at-will employee, unprotected either by personal contract with Waukesha County or by union agreement. The issue is thus whether, under the circumstances of this case, public policy in Wisconsin prohibits her employer from discharging her for "insubordination" when that insubordination was her refusal to follow her employer's unlawful order.

At common law, an employer could fire an at-will employee for any reason or no reason—thus the term "at will." *Brockmeyer*, 113 Wis. 2d at 566–567, 335 N.W.2d at 837. *Brockmeyer* modified this common-law doctrine in Wisconsin, and held that an at-will "employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing

535

law"; namely, as "evidenced by a constitutional or statutory provision," *id.*, 113 Wis. 2d at 573, 335 N.W.2d at 840, in "spirit" as well as "the letter," *Winkelman*, 168 Wis. 2d at 21, 483 N.W.2d at 214. As noted, *Winkelman* expanded the reach of *Brockmeyer* to encompass administrative rules as well: "Where a fundamental and well-defined public policy is evidenced by an administrative rule, a discharge for an employee's refusal to violate that public policy is actionable." *Winkelman*, 168 Wis. 2d at 15–16, 483 N.W.2d at 212. The proof is in three stages: First, the employee must "identify a fundamental and well-defined public policy." *Id.*, 168 Wis. 2d at 24, 483 N.W.2d at 216. This is a question of law for the court. *Ibid.* Second, the employee "must prove that the discharge violated that policy." *Ibid.* This is a question of fact for the jury. *Id.*, 168 Wis. 2d at 25, 483 N.W.2d at 216. Third, if the employee satisfies the first and second steps, the employer has the burden of proving "that the discharge was for just cause." *Id.*, 168 Wis. 2d at 24, 483 N.W.2d at 216.[2]

*Winkelman* involved a long-time maternity nurse who, unlike the other nurses at the hospital at which she worked, did not " 'float' to other parts of the hospital where nursing help was needed." *Id.*, 168 Wis. 2d at 16, 483 N.W.2d at 212. One day, when the maternity area of the hospital was overstaffed, Betty Winkelman was told that she would have to help out in post-operative and geriatric care. *Id.*, 168 Wis. 2d at 17, 483 N.W.2d at 213. Winkelman complained that she did

---

[2] *Winkelman* did not rule whether the third step also is a question of fact for the jury, and we do not discuss it here because that issue is not material to our decision. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989) (cases should be decided on the narrowest possible grounds).

not believe that she was qualified for any assignment other than maternity nursing. *Ibid.* When she refused to comply with the order, and went home rather than attempt to find a replacement who could cover for her, Winkelman was fired. 168 Wis. 2d at 17-18, 483 N.W.2d at 213.

Winkelman claimed that the hospital had violated a "fundamental and well-defined public policy" by assigning her work for which she was not qualified. She argued that her reassignment violated WIS. ADM. CODE § N 7.03(1)(g), which made it "negligence" to "[o]ffer[ ] or perform[ ] services as a licensed practical nurse or registered nurse for which the licensee or registrant is not qualified by education, training or experience." *Id.*, 168 Wis. 2d at 18–19, 483 N.W.2d at 213. Section 441.07(1)(c), STATS., authorized the Board of Nursing to impose sanctions on any nurse guilty of negligence. *Winkelman*, 168 Wis. 2d at 19, 483 N.W.2d at 213. In affirming the trial court's judgment in Winkelman's favor, the supreme court held that the "fundamental and well-defined public policy" identified by her was "that a nurse should not offer or perform services for which he or she 'is not qualified by education, training or experience.' " *Id.*, 168 Wis. 2d at 24, 483 N.W.2d at 216 (quoting WIS. ADM. CODE § N 7.03(1)(g)). Reilly claims that her actions on December 17, 1989, fall within *Winkelman*'s protection. We disagree.

According to Reilly's submissions on summary judgment, there was a history of inadequate staffing at the Waukesha facility. Further, Weber admitted in his testimony that he had received complaints before December 17, 1989, about the problem. Indeed, in 1987, Weber had sought, unsuccessfully, a waiver of the rule that prohibited a person from being responsible for both units at the same time. Weber also

admitted that he knew before December 17 that the secure unit at the facility was not going to be "properly covered" that night. When Reilly reported for work shortly before the start of her shift at 11 p.m., she was told that she was the only female scheduled to work that shift, and that she would have to cover both the unsecured and secured units. There were two girls in the secured unit that night, and they were locked in their rooms during the third shift. After her supervisor refused to put his direction in writing, Reilly refused to cover both units. She testified that she believed that it would not be safe for the girls in the non-secure area to be left alone while she did bed checks in the secured area. She admitted, however, that she did not know who would watch the children in the secured area if she did not. No bed checks were done in that unit after the third shift started at 11 p.m.[3] No one disagreed with Weber's assessment that fire was a significant danger to the residents at the facility. Although Reilly testified that it was unsafe to have one person watch both the non-secure and secure units, Turner testified to the contrary.

The safety of juveniles in residential facilities is the underlying rationale of the requirement in WIS. ADM. CODE § HSS 346.08(5)(b)(3) that "no staff member responsible for supervision of juveniles in a secure detention living unit may during the same time period have responsibility for the supervision of juveniles in a non-secure unit." Safety of children in these facilities

[3] Although Turner was available to do bed checks on the two girls in the secured area, Weber testified that he did not want to have a male assume that responsibility, even though there was, apparently, no rule against it. Reilly testified that Turner slept through at least part of the third shift that night.

538

is, of course, "a fundamental and well-defined public policy" as that phrase is used in *Winkelman. Id.*, 168 Wis. 2d at 15–16, 483 N.W.2d at 212. Thus, § HSS 346.08(5)(b)(3) was issued by the Department of Health & Social Services in order to comply with § 48.22(2)(a), STATS. (1987–88), which directed the Department to "promulgate rules establishing minimum requirements for the approval of the operation of secure detention facilities and the juvenile portion of county jails" so as "to protect the health, safety and welfare of the children in these facilities."[4] Significantly, it is the children's safety that is the essence of the public policy that underlies the rule, not the mechanism by which the rule enforces that policy. Thus, the prohibition that was found in WIS. ADM. CODE § HSS 346.08(5)(b)(3) was repealed in 1992. *See supra* note 1. This is the distinction between this case and *Winkelman*, where there were two, albeit imbricated, fundamental policies: (1) the protection of patients, and (2) that no nurse should be assigned duties for which he or she was unqualified. Thus, although there are other ways to advance the safety of children in juvenile facilities than to prohibit any child-care worker from covering both the secure and non-secure units at the same time (indeed, those other ways are now being used because the mandate in former HSS § 346.08(5)(b)(3) no longer exists), preventing nurses from giving care for which they are not qualified is a fundamental policy in and of itself. Stated another

---

[4] The current version of the statute, § 48.22(2)(a), STATS. (1993–94), is similar, except it recognizes that the Department of Corrections has taken over primary responsibility in this area. The current statute directs the Department of Corrections, however, to consult with the Department of Health and Social Services. *Ibid.*

way, unlike the situation in *Winkelman*, where WIS. ADM. CODE § N 7.03(1)(g) reified a discrete "fundamental and well-defined public policy," WIS. ADM. CODE § HSS 346.08(5)(b)(3) did not, and, as noted, has been repealed. Thus, Weber's dismissal of Reilly for her refusal to violate § HSS 346.08(5)(b)(3) was not contrary to *Winkelman*; he could reasonably believe that her refusal jeopardized the safety of the two girls in the secure unit—even though he might have been equally at fault for permitting the situation to develop to the point where Reilly was faced with the choice of either disobeying WIS. ADM. CODE § HSS 346.08(5)(b)(3) or arguably putting some of the children in the facility at risk.[5] As the federal court of appeals observed, in reflecting on whether Reilly's discharge stated a claim under *Winkelman*:

> Would Wisconsin really give persons caring for juvenile detainees the right to leave a custodial unit unsupervised? There are good and bad ways to oppose illegal orders. Reilly could not have shot Turner in order to protest the order; leaving wards of the state unattended is more civil but places the interests of the employee ahead of the interests of the children in a way that a state might believe the employer need not tolerate.

*Reilly*, 993 F.2d at 1287.

---

[5] Given Reilly's intransigence that night, we are also troubled that Turner did not either attempt to make other arrangements to make sure that the girls in the secure unit were covered (a second-shift female child-care worker, who did the 11 p.m. bed check in the secure unit testified that she was not asked to work through the third shift) or cover the unit himself. What the record demonstrates to be Turner's malfeasance that night, however, is not before us, and it does not excuse Reilly's actions.

*By the Court.*—Judgment affirmed.

SCHUDSON, J. (*dissenting*). The majority cites the correct standard for our analysis of this appeal but then fails to apply it. Under *Winkelman v. Beloit Memorial Hospital*, 168 Wis. 2d 12, 15-16, 483 N.W.2d 211, 212 (1992), "[w]here a fundamental and well-defined public policy is evidenced by an administrative rule, a discharge for an employee's refusal to violate that public policy is actionable." If the discharged employee "identif[ies] a fundamental and well-defined public policy" as a matter of law, the employee then "must prove that the discharge violated that policy." *Id.* at 24, 483 N.W.2d at 216. Whether the employee proves such a violation is a factual question for the jury. *Id.* at 25, 483 N.W.2d at 216.

Thus, the issue on appeal in this case reduces to whether the administrative rule that Reilly was ordered to violate presented "a fundamental and well-defined public policy." If not, summary judgment was appropriate. If so, summary judgment was not appropriate and a jury must determine whether Reilly's discharge violated the fundamental and well-defined public policy.

Did a fundamental and well-defined public policy prohibit Reilly from supervising both the secure and non-secure units of the juvenile detention center? The answer is inescapable. Section 48.22(2)(a), STATS. (1987-88), provided, in part:

> The department of corrections *shall promulgate rules establishing minimum requirements for the approval of the operation of secure detention facilities* and the juvenile portion of county jails. *The plans and rules shall be designed to protect the*

*health, safety and welfare of the children in these facilities.*

(Emphasis added.) Pursuant to that statutory mandate, the department of corrections promulgated rules including WIS. ADM. CODE § HSS 346.08(5)(b)(3), which provided that "[n]o staff member responsible for supervision of juveniles in a secure detention living unit may during the same time period have responsibility for the supervision of juveniles in a non-secure unit."

Thus, as the majority concedes, when Reilly was ordered to supervise the juveniles in both secure and non-secure detention, she was ordered to break the law. Further, she was ordered to violate the specific rule that set a "minimum requirement[ ]" that the department had determined to be essential "to protect the health, safety and welfare of the children" in the detention facility. *See* § 48.22(2)(a), STATS. Remarkably, however, the majority concludes that while the "[s]afety of children in these facilities is, of course, 'a fundamental and well-defined public policy,' " "the mechanism by which the rule enforces that policy" is not. Majority op. at 538–539. Neither law nor logic supports any such distinction.

One need go no further than the mandatory words of the statute and administrative rule to appreciate that the prohibition of staff supervising both secure and non-secure detention was a "fundamental and well-defined policy." In this case, however, for anyone who might have had the slightest lingering doubt, there was more. As the majority concedes, Waukesha County asked the State of Wisconsin to waive the rule. Majority op. at 537. The State of Wisconsin said no; the staffing rule was mandatory, "well-defined," and mini-

mally-required for lawful operation of a juvenile detention center.[1]

Reilly identified a fundamental and well-defined public policy, established by statute and administrative rule, and further confirmed by the State of Wisconsin's refusal to deviate from the policy in its specific application to the Waukesha juvenile detention center. Thus, under *Winkelman*, it remained for a jury to determine whether Reilly's discharge violated the policy. Accordingly, I respectfully dissent.

---

[1] It is curious that the majority repeatedly refers to the fact that, subsequent to the incident in this case, the rule was repealed. Majority op. at 531 n.1 and 539. In the first place, a 1992 revision of the rules has no bearing on the law as it existed in 1989. In the second place, as the majority points out, the revised rule mandates "at least one security staff member on duty at all times in each living area where juveniles are present." Thus, had she followed the order to supervise two living units alone, Reilly would have acted in violation of what later became the new rule.