Colleen SCHULTZ, Plaintiff-Respondent-Cross Appellant-Petitioner,

v.

# PRODUCTION STAMPING CORPORATION, Defendant-Appellant-Cross Respondent.

Supreme Court

*No. 86–0958. Argued November 29, 1988.—Decided February 7, 1989.*

(Also reported in 434 N.W.2d 780.)

For the plaintiff-respondent-cross appellant-petitioner there were briefs and oral argument by *Leonard A. Tokus,* of Milwaukee.

For the defendant-appellant-cross respondent there was a brief by *Jere W. Wiedenman, Michael A. Bowen, Gregg H. Dooge,* and *Foley & Lardner,* Milwaukee, and oral argument by *Mr. Bowen.*

CALLOW, WILLIAM G., J.   This is a review of an unpublished decision of the court of appeals reversing a judgment and an order of the circuit court for Milwaukee county, Judge Michael J. Skwierawski, granting damages to Colleen Schultz in the amount of $173,042.42 from Production Stamping Corporation.

We address two issues in this case. First, has Colleen Schultz (Schultz) demonstrated a fundamental and well-defined public policy that employers must disclose the details of a Simplified Employee Pension plan (SEP) to its employees prior to requiring them to participate in the plan? Second, if such a policy exists, did Production Stamping Corporation (Production

Stamping) wrongfully discharge Schultz by terminating her when she refused to obey its command to join the SEP without being given adequate information concerning the plan?

We hold that Schultz has not demonstrated that she was wrongfully discharged. We conclude there was no fundamental and well-defined public policy that required employers to disclose details of a SEP before employees could be required to join the plan as a condition of employment at the time the plan was adopted by Production Stamping. Further, we conclude that, even if such a public policy existed, Schultz's wrongful discharge claim would fail because the record reveals that she was terminated for non-participation in the plan. She asked no questions of Production Stamping about the plan, nor did she ask for additional information.

Schultz worked as a press operator for Production Stamping for sixteen years between 1964 and 1980. She was an employee-at-will. In July or August of 1979, Production Stamping received information about a SEP, and it was interested in setting up such a plan at Production Stamping. Vice President Donald Rich (Rich) testified that Production Stamping found a SEP attractive because it involved little administrative work once the company made contributions to the Individual Retirement Accounts (IRAs) of its employees. Production Stamping chose not to implement the plan at that time for two reasons. First, employees over seventy years of age could not participate. Second, each employee could choose his or her own financial institution to hold that employee's IRA.

On either April 7 or 8, 1980, Production Stamping learned that the two provisions it found unacceptable had been modified. Because it wanted to give employees

19

the benefit of the plan for 1979 it was required to implement the plan by April 15, 1980.

Rich called an employees meeting on April 10, 1980. He testified that, at the meeting, he explained that each employee had to participate in the plan for any employee to receive its benefits. He explained that each individual would establish an IRA by signing an IRA agreement form and a signature card. He told them that by doing so each employee became owner of his or her IRA and that the company had no control over it. He also told the employees that the plan had to be implemented by April 15. His presentation lasted about fifteen minutes. Rich then answered questions for ten minutes. Schultz did not ask any questions at this time.

When the meeting was over Rich called the employees in order of their seniority and directed them to sign the IRA application form and signature card. Schultz testified that when she was called Rich told her that she would be discharged if she did not sign the documents. She also testified that she twice asked Rich if she could call her husband before signing the documents. Rich refused her request. She then signed the documents.

Schultz was given and took home IRS form 5305–SEP and an amended W–2 form indicating that she had received an additional $958.67 in compensation for 1979. She discussed the meeting with her husband and told him that she had signed two documents. She told him that, as she understood Rich's explanation of the plan, they would have to transfer all their money to the M&I Bank. Mr. Schultz was upset that she had signed documents she did not understand, and he told her to cross her name off the documents. The next day Schultz asked Rich if she could remove her name from

the documents. Rich told her that she could do so as long as she was aware of the consequences of her action. She asked no further questions and crossed her signature off the documents. Rich immediately told her that she was terminated. Even then Schultz did not ask any questions, nor did she ask for additional information. Twenty-seven other employees were eligible to join the plan. Each did so.

On July 31, 1981, Schultz filed a complaint alleging that Production Stamping wrongfully discharged her. Upon a motion by Production Stamping, the circuit court dismissed the complaint. Schultz appealed this judgment of dismissal. On March 31, 1983, the court of appeals reversed the judgment and instructed the circuit court to grant Schultz leave to file an amended complaint.

Schultz filed an amended complaint on August 1, 1983. She filed a second amended complaint on June 29, 1984. At trial the jury found that Schultz's discharge violated a "well established and important public policy." It also awarded Schultz damages to compensate her for the loss of past and future income. On April 9, 1986, the circuit court entered judgment against Production Stamping and ordered it to pay Schultz damages of $173,042.42.

Production Stamping appealed the circuit court's judgment. Relying on *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 396 N.W.2d 167 (1986), the court of appeals summarily reversed the judgment. The court of appeals held that Schultz did not establish that Production Stamping required her to violate any constitutional or statutory provision, and thus she did not demonstrate that she had been wrongfully discharged.

We agree with the decision of the court of appeals. Like the court of appeals we find that the standard

under which an employee-at-will has a cause of action for wrongful discharge is set forth in *Bushko*. A discharged employee has a cause of action if the discharge was a result of the employee "refusing a command to violate public policy as established by a statutory or constitutional provision." *Id.* at 141.

This is a narrow and limited exception to the general rule that an employee-at-will may be terminated for any reason. As we stated in *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 573, 335 N.W.2d 834 (1983), when we first recognized this exception, the discharge must be contrary to a "fundamental and well-defined public policy." This public policy must be clearly defined by reference to a specific statutory or constitutional provision. *Id.* "Courts should proceed cautiously when making public policy determinations. No employer should be subject to suit merely because a discharged employee's conduct was praiseworthy or because the public may have derived some benefit from it." *Id.* at 573–74.

An employee states a claim for wrongful discharge when he or she is terminated for refusing an employer's command to act contrary to public policy embodied in the spirit of a statutory or constitutional provision, as well as in the letter of the provision. *Bushko,* 134 Wis. 2d at 143. In *Wandry v. Bull's Eye Credit Union,* 129 Wis. 2d 37, 49, 384 N.W.2d 325 (1986), we held that a discharged employee stated a claim for wrongful discharge when she refused to reimburse her employer for the amount of a dishonored check. Section 103.455, Stats., upon which we relied, only prohibits an employer from deducting work-related losses from an employee's wages. *Id.* at 44. It does not specifically prohibit an employer from seeking reimbursement from employees.

*Id.* We found, however, that this violated the spirit of the statute which prohibits employers "from using coercive economic power to shift the burden of a work related loss from the employer to the employee, without giving the employee an opportunity to establish that the loss was not caused by the employee's carelessness, negligence or wilful misconduct." *Id.* at 45–46. In summary, to state a claim for wrongful discharge the employee must establish that he or she refused to obey an employer's command to violate public policy established in the letter or spirit of a statutory or constitutional provision.

We now apply this standard to the case at hand. Schultz contends that she was terminated when she refused to be coerced into signing up for a pension plan about which she was given inadequate information in violation of public policy. She insists that public policy established in the spirit of federal and state laws requires disclosure of pension plan information before an employee joins the plan. She claims that she was not given this information at the time she was required to make a decision whether to join the pension plan. She insists that she was terminated for refusing to join under these circumstances.

We find that Schultz's claim fails because she has not set forth a fundamental and well-defined public policy that employees must be given plan information before being required to join a SEP. She alleges that both federal and state law require that employees be given pension plan information. She cites the Employee Retirement Income Security Act (ERISA) which states that it is "the policy of this chapter to protect ... the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial

and other information with respect thereto." 29 U.S.C. sec. 1001(b) (1982). She notes that included in the information to be provided is a summary plan description which "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. sec. 1022(a)(1) (1982). This provision, however, is subject to sec. 1024(b) which states that this information does not need to be given to the beneficiary until *after* participation in the plan begins.

> (1) The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of summary, plan description, and all modifications and changes referred to in section 1022(a)(1) of this title—
>
> > (A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or
> >
> > (B) if later, within 120 days after the plan becomes subject to this part.

29 U.S.C. sec. 1024(b)(1) (1982). There is simply no requirement in ERISA that a beneficiary be given a plan summary *before* joining the plan.

By giving Schultz an amended W–2 form and IRS form 5305–SEP before she removed her name, Production Stamping actually gave her *more* information than it was required to give under the law. We find it significant in determining what the public policy was on April 10, when this matter was discussed with the employees, that on April 11, 1980, a new federal regulation became effective which provided employers

an alternative method of compliance with disclosure requirements. 29 C.F.R. sec. 2520.104–48 (1987). By providing an employee with a copy of IRS form 5305–SEP at the time of eligibility, an employer can satisfy the requirement of the regulation relating to the establishment of a SEP. *Id.* Production Stamping fulfilled the requirements of this regulation even though the regulation did not become effective until the day after Production Stamping presented the plan to its employees.

Schultz also relies on sec. 641.06, Stats.,[1] to support her position that public policy requires employers to disclose information to employees. She contends that this provision, combined with Wis. Admin. Code sec. Ins 8.08 (Dec. 1978), sets out such a public policy. Section 641.06, however, makes no reference to the disclosure of pension information. It is a broad statement of legislative intent that employee welfare funds are beneficial and that the growth of such funds should be encouraged. Section Ins 8.08 does provide for certain disclosures to be made. It states in relevant part:

> The following information shall be available to all fund participants, including covered employes and their beneficiaries, contributing employers and

---

[1]Section 641.06, Stats., provides:

It is declared to be the policy of this state that employe welfare funds are of great benefit to employes and their families and that their growth should be encouraged; that the establishment and management of such funds vitally affect the well-being of millions of people and are in the public interest; and that such funds should be supervised by the state to the extent necessary to protect the rights of employes and their families, without imposing burdens upon such funds which might discourage their orderly growth and without duplicating the supervisory responsibilities presently vested in any state agencies.

 participating labor organizations, in the office of the fund at all reasonable hours ....

  (1) Copy of registration statement under s. 641.08, Stats., including all current fund documents specified by such statement....

  (2) Copies of annual statements under s. 641.13, Stats., for the 3 latest fiscal years.

  (3) Copy of latest report of examination of the fund by the commissioner of insurance.

Neither this provision nor sec. 641.06, however, either explicitly or implicitly states that employers must disclose pension plan information to employees *before* requiring their participation in the plan.

█

We conclude that Schultz has not pointed to a fundamental and well-defined public policy that requires disclosure of information before employees can be required to participate in the plan. Schultz argues that one with a limited intellectual capacity is entitled to greater consideration. Intellectual capacity plays no role in this case, however, because we conclude there was no public policy requiring disclosure of plan information.

Even if we were to conclude, however, that Schultz has demonstrated such a public policy, her claim would still fail. She has not demonstrated that she was terminated for refusing an employer's command to join the plan with inadequate information. The record reveals that Schultz was terminated simply for refusing to join the SEP. Rich told the employees at the meeting that everyone was required to join the plan. When Schultz came to cross her name off the documents she had signed, Rich warned her that she would lose her job if she cancelled her participation in the plan.

The testimony revealed that, even if Schultz believed she needed additional information before joining the plan, she never communicated this need to Rich or anyone else at Production Stamping. She did not ask questions at the employee's meeting. She did not ask questions or request more information on April 11 when she crossed her name off the documents she had signed the day before. Further, Production Stamping gave Schultz information about the plan. It gave her, and she took home, form 5305–SEP which contained a series of questions and answers about the SEP.

Production Stamping was within its rights to discharge Schultz for non-participation. 26 U.S.C. sec. 408(k)(2) (1982)[2] states that the plan must include each eligible employee. In addition, a provision in form 5305–SEP stated: "your employer may require that you become a participant in such an arrangement as a condition of employment." Schultz cancelled her participation in the plan and was terminated for her non-participation.

We conclude that Production Stamping's actions in this case do not constitute wrongful discharge under the standard set forth in *Bushko*. Public policy promotes the existence and growth of employee pension plans. Schultz's failure to participate in the SEP would have defeated the rights of twenty-seven other people to

---

[2]26 U.S.C. sec. 408(k)(2)(1982) provides, in relevant part:

This paragraph is satisfied with respect to a simplified employee pension for a calendar year only if for such year the employer contributes to the simplified employee pension of each employee who—

(A) has attained age 25, and
(B) has performed service for the employer during at least 3 of the immediately preceding 5 calendar years.

receive pension benefits. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J.   (concurring). I agree with the majority's conclusion that the plaintiff has not satisfied her burden of identifying a fundamental and well-defined mandate of public policy which the discharge is alleged to have violated.

I do not, however, join the dicta in the opinion concluding that the plaintiff's claims would fail even if she had adequately identified a public policy embodied in statutory or constitutional law. As I observed in my concurrence in *Bushko v. Miller Brewing Co.,* 134 Wis. 2d 136, 141, 396 N.W.2d 167 (1986), in which I was joined by Chief Justice Nathan S. Heffernan and Justice William A. Bablitch, the majority's requiring a command and refusal does not comport with the wrongful discharge rule stated and applied in prior cases. See *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 335 N.W.2d 834 (1983), *Wandry v. Bull's Eye Credit,* 129 Wis. 2d 37, 384 N.W.2d 325 (1986). The majority's requirement places form over substance. Almost every claim may be cast in the "refusal to violate" formulation.

I am authorized to state that Justice William A. Bablitch joins in this opinion.