**Kenneth E. WILCOX, Plaintiff–Appellant,**

v.

**NIAGARA OF WISCONSIN PAPER CORPORATION and Elmer Beale, Defendants–Appellees.**

**No. 91–2407.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1992.

Decided June 4, 1992.

Rehearing and Rehearing En Banc Denied July 23, 1992.

Vincent R. Petrucelli, Petrucelli & Petrucelli, Iron River, Mich. (argued), for plaintiff-appellant.

Michael B. Apfeld, Godfrey & Kahn, Milwaukee, Wis., John J. McGirl, Jr. (argued), Tracy A. Sykes, James C. Ohly, Doherty, Rumble & Butler, Minneapolis, Minn., for defendants–appellees.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and SHADUR, District Judge.*

* The Honorable Milton I. Shadur, of the Northern District of Illinois, is sitting by designation.

SHADUR, District Judge.

Kenneth Wilcox ("Wilcox") brought this wrongful discharge action against his former employer Niagara of Wisconsin Paper Corporation ("Niagara") and against Niagara's Elmer Beale ("Beale"), claiming that Wilcox's discharge violated Wisconsin public policy. He charged Niagara with breach of his employment contract and Beale with tortious interference with his contractual rights in that respect. Although it is somewhat problematic to treat the ensuing Niagara–Beale motion as one for summary judgment under Fed.R.Civ.P. ("Rule") 56 (a subject explored in the first section of this opinion), the district court granted dismissal of the action in favor of both defendants in those Rule 56 terms. We affirm as to Beale, but we reverse and remand as to Niagara.

### Procedural Considerations

Rule 56, like the rest of the Rules, has been in effect for over a half-century. Judicial receptivity to summary dispositions under Rule 56 has varied widely over that period, and it has taken a recent trilogy of Supreme Court decisions—*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—to give a major boost to the Rule's utility as a vehicle for the final disposition of lawsuits without the need for an evidentiary hearing.

But what the parties and the district court have tendered here does not fit comfortably within the Rule 56 mold. Instead Niagara's motion is really one attacking the sufficiency of Wilcox's Complaint under either Rule 12(b)(6) or Rule 12(c)—a sort of one-way Rule 56 motion. If we were to agree with the district court's view of the Wisconsin statute that Wilcox summons to his aid, the case is over because Wilcox could not prevail even on his own

version of the facts. But because we do not agree with the district court's reading, it remains for the factfinder—a jury—to determine whether or not Niagara really fired Wilcox for the reason claimed by Wilcox and, if so, whether or not Niagara's pre-firing demands on Wilcox were, as the Wisconsin statute at issue reads, "dangerous or prejudicial to [Wilcox's] life, health, safety or welfare."

That result is called for by the posture of the case as it evolved below. Although Niagara and Beale labeled their motion as one for summary judgment, their opening gun in support of that motion began in this fashion:

> Although Defendants vehemently deny Plaintiff's allegations, for purposes of this summary judgment motion, this Court can assume the facts of this case are as set forth in the allegations of Plaintiff's First Amended Complaint and Jury Demand ("Complaint").

Wilcox met that motion on its own terms, though pointing out accurately enough that in substance it was really a Rule 12(c) motion for judgment on the pleadings. Accordingly Wilcox's counsel concluded the responsive memorandum by asking not for a judgment in Wilcox's favor but simply for denial of the motion. And the district judge then began his opinion granting the motion by referring expressly to the language that we have just quoted from defendants' initial memorandum of law. All that being true, it would plainly be inappropriate for us to foist upon the parties or the district judge a choice that they had not knowingly made—one calling for outright reversal without the opportunity to have the facts aired at trial.

## Facts [1]

Wilcox was employed as Niagara's director of computer operations for 13 years. When Niagara's computer system malfunctioned during the week of March 27, 1989,[2] Wilcox worked long hours on its repair. During that five-day work week he spent a total of 61 hours on the job, 35 of which he accumulated on Thursday and Friday alone.

Wilcox, who had undergone heart surgery during 1988, left work at 9:30 p.m. on Friday, March 31 after he began to experience angina pains. Later that evening the mill manager[3] called Wilcox at home and told him to be at work on both Saturday and Sunday. Wilcox explained that he was exhausted after working so many hours and was feeling ill, and he assured the manager that the computer system would be operational by the next Wednesday, April 5 (the first date on which it would be needed). Nonetheless the manager told Wilcox that he would be dismissed if he did not work over the weekend. Later that evening Wilcox was hospitalized due to his chest pain and he was released the next day with instructions to "take it easy."

Wilcox returned to work on Monday, April 3, and he did indeed complete all repairs required to make the computer system fully operational by April 5, the date on which Niagara had intended to resume production after a temporary shutdown that had resulted from a lack of orders. Thus Wilcox was as good as his word, and Niagara suffered no detriment at all from Wilcox's not having put in the additional

1. We review the district court's grant of summary judgment de novo (*Matuszak v. Torrington Co.,* 927 F.2d 320, 322 (7th Cir.1991)). As reflected in the just-completed section of this opinion, defendants have agreed solely for purposes of their motion to accept as true the allegations in Wilcox's Complaint. We are therefore not required to make the usual Rule 56 determination of whether there exist any genuine issues of material fact. We need only determine whether, drawing all reasonable inferences from the Complaint's allegations in Wilcox's favor, his action ought to be dismissed as a matter of law.

2. Because all relevant dates were during the year 1989, the year designation will be omitted from now on.

3. Wilcox's Complaint does not identify Beale's specific position with Niagara, though the parties' submissions sometimes refer to him as the mill manager and at other times identify him as Wilcox's "supervisor" or as Niagara's president. Of course only the Complaint may serve as the source of our information for current purposes, but it does not matter—whatever position or positions Beale in fact held with Niagara, the analysis in this opinion remains unaffected.

hours that Niagara's manager had insisted upon.

Wilcox was fired on April 6. Although he was told that his dismissal was due to his poor management style, for present purposes we must accept his allegation that he was actually terminated because of his failure to work during the preceding weekend.

### Wilcox's Claim Against Niagara

Wilcox has selected the proper legal rubric for his action against Niagara by suing it for breach of contract. As *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 575–76, 335 N.W.2d 834, 841 (1983) (footnote omitted) has explained Wisconsin law in that respect:

> [W]e conclude that a contract action is most appropriate for wrongful discharges. The contract action is essentially predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy. Tort actions cannot be maintained.

 Because Wilcox had no formal employment contract with Niagara and the term of his employment was indefinite, he was an "employee-at-will." Under the at-will doctrine in Wisconsin as in most other states, an employer is free to terminate an employee to whom it has no contractual obligations whenever and for whatever reasons it so desires: "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong" (*Brockmeyer,* 113 Wis.2d at 567, 335 N.W.2d at 837).

 Exceptions to the at-will doctrine have been created by various federal and state statutes that prohibit certain forms of discrimination (see *id.* at 567–68, 335 N.W.2d at 837–88). In addition, *Brockmeyer* recognized a "public policy exception" to the at-will doctrine, under which "an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined

public policy as evidenced by existing law" (*id.* at 573, 335 N.W.2d at 840).

Wilcox contends that his discharge violated the public policy embodied in Wis.Stat. § 103.02,[4] which read at the time of Wilcox's termination (and had been in this same form since October 1975):

> No person may be employed or be permitted to work in any place of employment or at any employment for such period of time during any day, night or week, as is dangerous or prejudicial to the person's life, health, safety or welfare. The department shall investigate, ascertain, determine and fix such reasonable classification, and promulgate rules fixing a period of time, or hours of beginning and ending work during any day, night or week, which shall be necessary to protect the life, health, safety or welfare of any person, or to carry out the purposes of ss. 103.01 to 103.03. The department shall, by rule, classify such periods of time into periods to be paid for at regular rates and periods to be paid for at the rate of at least one and one-half times the regular rates. Such investigations, classifications and orders shall be made pursuant to the proceeding in ss. 101.01 to 101.25 which are hereby made a part hereof, so far as not inconsistent with ss. 103.01 to 103.03, and every order of the department shall have the same force and effect as the orders issued under ss. 101.01 to 101.25 and the penalties therein shall apply to and be imposed for any violation of ss. 103.01 to 103.03. Such orders shall be subject to review in the manner provided in ch. 227.

In Wilcox's view, the first sentence's reference to "such period of time ... as is dangerous or prejudicial to *the person's* life, health, safety or welfare" reflects a legislative concern with the health and welfare of employees on an individual rather than a collective basis. But the statutory language is scarcely a model of precision in drafting—its second sentence seems to look in the other direction when it directs "the department" (in this instance the Department of Industry, Labor and Human Rela-

---

4. All further citations to the Wisconsin statutes will simply take the form "Section __."

tions, "Department" for purposes of this opinion) to promulgate rules specifying those hours of work that are necessary to protect the health and welfare of "any person."

Despite the second sentence's apparently mandatory language, Department has not responded by issuing a categorical determination of maximum hours. Instead Department's implementing regulation adopted in April 1977 (Wis.Admin.Code § 74.02 [5]) simply provides:

No person shall be employed or be permitted to work in any place of employment or at any employment for such period or periods of time during any day, night, or week as shall be dangerous or prejudicial to the life, health, safety or welfare of such person.

That nearly verbatim repetition of the statute's first sentence obviously treated the second sentence's apparent call for an objective set of numbers as less than a statutory command to that effect.[6] In fact, the regulation's replacement of the statutory term "the person" with Department's reference to "such person" makes the individual focus even more explicit.

If the Wisconsin legislature had disagreed with Department's regulatory implementation of Section 103.02, it has had ample opportunity to override Code § 74.02 during the 15 years since its 1977 adoption. In fact the legislature did revisit Section 103.02 in 1989, when it amended that statute to provide an express remedy for employees who have been discharged for attempting to enforce their rights under the act.[7] Legislative silence may not always be a reliable clue to ratification of the reading that has been given to statutory language (for example by later court decisions), but the history in this instance reflects more than mere silence—it shows the legislature's express consideration of a specific section of the statute resulting in an amendment to that section, but without making any change to undo the effect of regulatory language that had then been in place for 12 years.

Even without the passage of a statutory amendment that confirms that the legislature has paid express attention to whatever statute is at issue, the Wisconsin Supreme Court has regularly expressed itself in these terms (repeated verbatim in such cases as *Layton School of Art & Design v. Wisconsin Employment Relations Comm'n*, 82 Wis.2d 324, 340, 262 N.W.2d 218, 226 (1978) and *Wisconsin Dept. of Revenue v. Exxon Corp.*, 90 Wis.2d 700, 733, 281 N.W.2d 94, 112 (1979)):

Long-standing administrative construction of a statute is accorded great weight in the determination of legislative intent because the legislature is presumed to have acquiesced in that construction if it has not amended the statute.

Accord, such cases as *State v. Anderson*, 160 Wis.2d 435, 441–42, 466 N.W.2d 681, 683 (App.1991). And that principle has also been applied (really a fortiori) where the legislature has in fact amended the statute in respects other than the one under current consideration (see, e.g., *State ex rel. City of West Allis v. Dieringer*, 275 Wis. 208, 224, 81 N.W.2d 533, 541–42 (1957)).

Under the circumstances here and under the teaching of Wisconsin case law, we view the Wisconsin legislature's action (and

---

**5.** Further citations to the Administrative Code will take the form "Code § __."

**6.** It is of course commonplace that not every use of the word "shall" is treated as mandatory for legal purposes, even though the word normally has that meaning (see, e.g., *State of Wisconsin v. R.R.E.*, 162 Wis.2d 698, 707, 470 N.W.2d 283, 286 (1991)). By contrast, Department did treat the statute's third sentence as a mandate to classify periods of time for regular and overtime pay, responding with particular rules that are reflected in Code §§ 74.03–.04. That action suggests strongly that Code § 74.02 does not reflect an oversight, but instead evinces Department's determination after conducting the investigation that was called for by Section 103.02 (it will be recalled that a full 18 months elapsed between the statutory enactment and the promulgation of Code § 74.02) that the legislative goal of protecting employees' "life, health, safety or welfare" would be best served by individualized determinations rather than by setting hard and fast hourly standards of universal applicability.

**7.** That modification, which postdated Wilcox's action, is of course not relevant for his purposes.

inaction) as an implicit ratification of the regulatory language, and hence of the virtually identical first sentence of the statute, as themselves setting out the rights of employees and the duties of their employers. In the sense that is meaningful for this case, the statute and its implementing regulation reflect the public policy of the State of Wisconsin.

## Public Policy Exception

■ *Wandry v. Bull's Eye Credit Union*, 129 Wis.2d 37, 41–42, 384 N.W.2d 325, 327 (1986) describes a two-step process for analyzing wrongful discharge actions under the public policy exception. For that purpose the court must determine whether the employee has:

> 1. identified "a fundamental and well-defined mandate of public policy" that derives from a constitutional or statutory source and
>
> 2. established that his or her discharge violated that public policy.

In this instance Section 103.02 is the statute that meets the first of those criteria: It is surely a public policy mandate, and as our brief survey of the Wisconsin case law will reflect, it is at least as well-defined as other standards that the Wisconsin state courts have enforced via other wrongful discharge lawsuits. In that respect we need not address the question sometimes encountered in such other wrongful discharge actions: whether and to what extent it may be appropriate to go beyond the express language of the statute in a search for the "public policy" that it embodies— here the express language suffices. But

we must certainly perform the second part of the analysis by determining whether Wilcox's discharge is sufficiently related to the defined public policy that it can be said to constitute a violation of that policy by Niagara.

Analysis of Wilcox's claim by the *Wandry*-dictated two-step approach requires some review of the Wisconsin Supreme Court's marking out of the boundaries of the public policy exception that it has created to the employment-at-will doctrine.[8] *Brockmeyer*, which first recognized that public policy exception, emphasized its narrowness but provided little concrete guidance as to its contours. It stated simply (113 Wis.2d at 573, 335 N.W.2d at 840):

> A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end.

It went on to caution that (*id.*):

> No employer should be subject to suit merely because a discharged employee's conduct was praiseworthy or because the public may have derived some benefit from it.

*Wandry* was the Court's second discussion of the exception. In addition to laying out the two-part analytic framework, it evinced a slightly more expansive approach to the public policy concept.[9] Wandry was

---

8. We have previously explored the Wisconsin public policy exception in *Beam v. IPCO Corp.*, 838 F.2d 242, 245–48 (7th Cir.1988).

9. Justice Steinmetz, who authored both *Brockmeyer* and *Bushko v. Miller Brewing Co.*, 134 Wis.2d 136, 396 N.W.2d 167 (1986)—which as discussed below retreated somewhat to *Brockmeyer's* more cautious treatment—dissented in *Wandry*. Conversely, Justice Abrahamson, who authored *Wandry*, wrote a concurrence in *Bushko* that disagreed with its more restrictive approach, then concurred again in the application of the *Brockmeyer–Wandry–Bushko* trilogy in *Schultz v. Production Stamping Corp.*, 148

Wis.2d 17, 434 N.W.2d 780 (1989) by reaffirming her *Bushko* view (Justice Abrahamson's views were joined by one or more other Justices in each of her two concurrences). Finally, just last month Justice Steinmetz' outlier position appears to have been confirmed once again by his lone dissent from the Supreme Court's reconfirmation and partial expansion of the public policy exception in *Winkelman v. Beloit Memorial Hosp.*, 168 Wis.2d 12, 483 N.W.2d 211 (1992). Fortunately we need not try to discern some trend from that apparent back-and-forth movement, for Wilcox's claim survives under the doctrine as announced in all five cases.

discharged after she refused to reimburse Bull's Eye for a loss it incurred when she cashed a stolen check. She claimed that her termination violated the public policy expressed in Section 103.455.[10] In reversing the lower court's dismissal of Wandry's complaint, *Wandry* applied a flexible interpretation at each step of the analysis.

In evaluating the existence of a relevant public policy, *Wandry* made two noteworthy contributions. First, it made clear that a statute need not explicitly address the termination of employees to express a policy that is relevant in that context (129 Wis.2d at 42, 384 N.W.2d at 327 (citations to *Brockmeyer* omitted)):

> The public policy, however, need not be expressed in a statute protecting an employee from discharge. The legislature "has not and cannot cover every type of wrongful termination that violates a clear mandate of public policy." There are public policies embodied in statutes and the constitution that do not specifically address wrongful discharge but are nevertheless meant to be "inherently incorporated into every employment-at-will relationship."

Even beyond that, Section 103.455 did not even directly address the type of employer behavior that was at issue in *Wandry*. Although the statute specifically forbids an employer's withholding of work-related losses from an employee's earnings without first having established that the employee was responsible for the loss, it does not in terms bar an employer from seeking reimbursement for work-related losses from an employee's own assets. *Wandry*, 129 Wis.2d at 46–47, 384 N.W.2d at 329 held that even though Bull's Eye might not have been liable under Section

103.455, its actions were sufficiently related to that statute to support Wandry's wrongful discharge action. *Wandry, id.* explained:

> We need not decide whether Bull's Eye would be liable for the civil penalty created by sec. 103.455. That Bull's Eye's conduct may not come within the express language of sec. 103.445 is not determinative of whether the complaint states a claim for wrongful discharge. *Brockmeyer* does not require that the discharge violate a statute to constitute a claim for wrongful discharge. *Brockmeyer* requires only that the discharge contravene the public policy evidenced in the statute. The public policy of a statute is not limited to the circumstances described in the statute. The public policy of a statute may be invoked in contexts outside the precise reach of the statute.

*Wandry* bridged the gap that existed between the facts before it and the literal terms of Section 103.455 by concluding that the statute "articulate[d] a fundamental and well-defined public policy proscribing economic coercion by an employer upon an employee to bear the burden of a work-related loss when the employee has no opportunity to show that the loss was not caused by the employee's carelessness, negligence, or wilful misconduct" (129 Wis.2d at 47, 384 N.W.2d at 329). *Wandry* consequently concluded that the plaintiff had succeeded in identifying a public policy stemming from a specific statutory source that was relevant to the circumstances of her discharge.

As for the second step of the analysis—the relationship between the discharge and that public policy—*Wandry* adopted a sim-

---

**10.** That statute merits repetition here, in material part, to understand its relationship to the facts surrounding Wandry's discharge:

> No employer shall make any deduction from the wages due or earned by any employe, who is not an independent contractor, for defective or faulty workmanship, lost or stolen property or damage to property, unless the employe authorizes the employer in writing to make such deduction or unless the employer and a representative designated by the employe shall determine that such defective or faulty work, loss or theft, or damage is due to worker's negligence, carelessness, or wilful and intentional conduct on the part of such employe, or unless the employe is found guilty or held liable in a court of competent jurisdiction by reason thereof. If any such deduction is made or credit taken by any employer, that is not in accordance with this section, the employer shall be liable for twice the amount of the deduction or credit taken in a civil action brought by said employe.

ilarly expansive stance. Drawing on the language of *Brockmeyer*, it set out the following guidelines (129 Wis.2d at 42–43, 384 N.W.2d at 327 (citations to *Brockmeyer* omitted)):

1. An employer is liable for wrongful discharge if it discharges an employee for refusing to violate a constitutional or statutory provision. Employers will be held liable for those terminations that effectuate an unlawful end.

2. The discharge must clearly contravene the public welfare and gravely violate paramount requirements of public interest.

3. An employer is liable for wrongful discharge if the employer discharges an employee for conduct that is "consistent with a clear and compelling public policy."

*Wandry, id.* at 48, 384 N.W.2d at 330 then concluded that Wandry's discharge violated the second and third of those requirements:

The discharge clearly violates the paramount requirements of the public interest and is based on the plaintiff-employee's conduct that is consistent with a clear and compelling public policy.

In the Wisconsin Supreme Court's next discussion of the public policy exception, *Bushko,* it returned to *Brockmeyer*'s original emphasis on narrowness and attempted to rein in *Wandry*'s more expansive potential by recharacterizing some of its conclusions. *Bushko* dismissed a wrongful discharge action brought by an employee who had been discharged after complaining about his employer's policies regarding plant safety, hazardous waste disposal and falsification of records, at least some of which violated Wisconsin statutes. To that extent those policies clearly violated Wisconsin public policy. *Bushko* understandably skimmed over that part of the analysis and left *Wandry*'s holding intact, summarizing it as having "extended the rule of *Brockmeyer* to include the spirit, as well as the clear language of a statutory provision" (134 Wis.2d at 143, 396 N.W.2d at 170).

Instead, *Bushko* focused on the second element of the analysis, the relationship of the discharge to the public policy. It rejected employee Bushko's complaint because, although his protests about practices of employer Miller Brewing Company ("Miller") may have been consistent with public policy, Busko did not allege that he himself was asked to participate in any of Miller's unlawful activity or that he was discharged for refusing to do so. *Bushko* thus rejected *Wandry*'s suggestion that an employer can be liable if it discharges an employee for conduct that is merely *"consistent with* a clear and compelling public policy" (*Wandry,* 129 Wis.2d at 48, 384 N.W.2d at 330 (emphasis added); *Bushko,* 134 Wis.2d at 143–46, 396 N.W.2d at 171–72). *Bushko* instead recharacterized *Wandry*'s holding as requiring that an employee, to state a claim for wrongful discharge, must have been compelled to act in a manner that is *contrary to* either the letter or the spirit of a statutory or constitutional provision.

Next *Schultz* really added nothing to the evolution of the basic *Brockmeyer–Wandry–Bushko* principle, which it stated in these terms (148 Wis.2d at 23, 434 N.W.2d at 783):

In summary, to state a claim for wrongful discharge the employee must establish that he or she refused to obey an employer's command to violate public policy established in the letter or spirit of a statutory or constitutional provision.

It found that the statutory policy sought to be called into play by the discharged employee there just did not exist (*id.* at 24, 434 N.W.2d at 784 (emphasis in original)):

There is simply no requirement in ERISA that a beneficiary be given a plan summary *before* joining the plan.

Finally, *Winkelman* has just last month reinforced the public policy exception, indeed extending it to such policies evidenced only by administrative rules as well as by statutory or constitutional provisions. It reiterated the teaching of the earlier cases that the public policy must be "fundamental and well-defined," (483 N.W.2d at 212 and 215), and it found that definition was met by an administrative rule "that a nurse should not offer or perform services for

which he or she 'is not qualified by education, training or experience'" (*id.* at 216).

As the ensuing discussion reflects, any objective reading of the statute at issue in this case compels the conclusion that, if compared with what was held in *Winkelman* to satisfy the Wisconsin Supreme Court's "fundamental and well-defined public policy" standard, it does so in a fortiori terms. In any case, it remains fair to say that in terms of the operative legal test the statement in *Wandry,* narrowed somewhat by *Bushko,* remains the teaching of that Court. From here on out this opinion will therefore refer to the standard in terms of those two cases, confident that an analysis in those terms gives Niagara all that it is due and perhaps more.

### Wilcox's Wrongful Discharge

■ Wilcox's claim falls squarely within the bounds of the public policy exception expressed in *Wandry,* even as reinterpreted (and probably narrowed) by *Bushko.* As already explained, Wilcox contends that his discharge violated the public policy embodied in Section 103.02—to repeat its relevant first sentence:

No person may be employed or may be permitted to work in any place of employment or at any employment for such period of time during any day, night or week, as is dangerous or prejudicial to the person's life, health, safety or welfare.

In light of *Wandry* (undisturbed in this respect by *Bushko*), the fact that Section 103.02 does not specifically speak of employee discharges plainly does not affect its applicability to Wilcox's action.

It is equally clear that the relationship between the specific facts surrounding Wilcox's discharge (as he states them) and the public policy announced in Section 103.02 also fits the *Wandry* analysis, even with the *Bushko* gloss. Wilcox became ill as a result of the extremely long hours that he had been working, was hospitalized on Friday night (as a result of that overwork) and could not have returned to work on Saturday without violating his physician's instructions to "take it easy." In the statute's terms, his compliance with the manager's demand for still more hours over the weekend would have required Wilcox to work "for such period of time ... as [was] dangerous or prejudicial to [his] life, health, safety or welfare." Niagara counters with the makeweight argument that because Wilcox had a long term heart condition, he might perhaps have stated a different cause of action for handicap discrimination—but it is totally unpersuasive to suggest that such an unproved possibility somehow takes his action out of the scope of Section 103.02. Wilcox's allegations, which control here, expressly link the effect on his health to the number of hours that he had been working.[11]

Requiring Wilcox to work on Saturday and Sunday, after he had already put in 35 hours over the preceding two days and while he was feeling exhausted and ill as a result of having worked those long hours, unquestionably contravened the letter as

---

**11.** It is also worth noting that Niagara's demands also surpassed those that are permissible under Section 103.85, which requires that employees be allowed "at least 24 consecutive hours of rest in every 7 consecutive days." To be sure, Section 103.85 provides an exception in cases of "breakdown of machinery or equipment ... requiring the immediate services of experienced and competent labor to prevent ... suspension of necessary operations." It may be that the mill manager thought that to be the case on Friday when he made the demand, but as matters turned out the exception did not apply: Wilcox did have the computer repaired (as he had promised) by the time that Niagara resumed production on Wednesday. On that score the dissent's statement that the "right perspective is *ex ante*" and not *ex post* ignores the

obvious: Wilson was fired *ex post,* when Niagara already knew that he had performed as he said he could. Niagara was apparently content to let Wilcox solve its temporary problem before it created a permanent one for him by terminating him. But of course what is most important in the posture of this case is that the facts, whatever they are, should be allowed to serve as grist for the jurors' mill and not for resolution in terms of judicial predilections as a matter of law. Finally, we need not decide for current purposes whether Wilcox's dismissal was also in violation of the policy embodied in Section 103.-85, for his action is not based on that section. All the same, its objective terms tend to buttress the conclusion that the hours demanded of Wilcox violated Wisconsin public policy.

well as the spirit of Section 103.02. Wilcox's action in those terms therefore falls within the scope of the public policy exception as expressed in both *Wandry* and *Bushko.*

As for the second step of the *Wandry–Bushko* analysis—the relationship between Wilcox's discharge and that public policy—Wilcox's claim also falls well within the range of the public policy exception authorized by both those cases. In fact, Wilcox's case precisely parallels *Wandry* in that regard. Like plaintiff Wandry in that case, Wilcox was discharged after he had refused to obey a command that a statute (or a public policy embodied in that statute) prohibited his employer from giving. It is insignificant for our purposes that *Wandry* and *Bushko* disagree on how to characterize the essential relationship between the discharge and the public policy. In the more demanding terms of *Bushko,* Niagara sought to compel Wilcox to act in a manner "contrary to" both the letter and spirit of Section 103.02 by jeopardizing his health because of Niagara's excessive demands. That is actionable under the Wisconsin case law.

We return once more to the point made earlier as to the posture of the case, one in which up´to now Wilcox's allegations have been accepted arguendo with all reasonable inferences in his favor. At trial he will be required to prove the truth of his allegations, including of course proof (1) that Niagara fired him because he refused to work during the added weekend hours, which would have heaped Pelion upon the Ossa of the preceding several days (including Wilcox's having worked 35 out of 48 hours during the two days preceding the weekend), and (2) that Niagara's requirements in that respect would have been "dangerous or prejudicial to [Wilcox's] life, health, safety or welfare." And that second issue obviously calls for proof of some degree of substantiality and not mere triviality.

### Wilcox's Claim Against Beale

■ In addition to the already-discussed wrongful discharge claim against Niagara itself, Wilcox charges Beale with tortious interference with contract. Wilcox claims that Beale induced Niagara to terminate Wilcox's employment contract and was the proximate cause of that termination.

*Mendelson v. Blatz Brewing Co.,* 9 Wis.2d 487, 490–91, 101 N.W.2d 805, 807 (1960) recognized a cause of action for unlawful interference with an employment contract, even if that contract was terminable at will. As Beale urged and as the district court held, however, corporate officers are protected by a privilege when they cause the corporation to terminate employees and may therefore be immune from liability (*id.* at 491–92, 101 N.W.2d at 807–08; *Lorenz v. Dreske,* 62 Wis.2d 273, 286–87, 214 N.W.2d 753, 759–60 (1974)).

We most recently visited the Wisconsin law relating to that privilege in *Farr v. Gruber,* 950 F.2d 399 (7th Cir.1991), where we treated with the closely-related (though not identical) context of a claimed tortious interference by a public official with the at-will employment of a public employee. We there repeated our earlier comment in *Kumpf v. Steinhaus,* 779 F.2d 1323, 1325 (7th Cir.1985) that "the law of privilege in Wisconsin is less than clear." And in doing so we pointed to the seemingly mixed messages that emanated from *Mendelson* and some later cases on the one hand and from *Lorenz* on the other.

Not surprisingly, there have been no intervening Wisconsin case law developments in the brief span of five months since we decided *Farr.* But no matter, for any perceived tension that exists between *Mendelson* and *Lorenz* does not affect the result here. As we said in *Farr,* 950 F.2d at 402 (citation omitted):

The premise of cases such as *Mendelson* and *Kumpf* is that there is a difference between personal and corporate disputes. Corporate employees are supposed to advance the interest of the firm and not private interests that may conflict with investors' welfare. Grudges are among the agency costs of business, and threat of liability for interference with another employee's relations with the firm induc-

es employees to give less weight to their private agendas.

Wilcox does not suggest that Beale was serving any master other than Niagara when he assertedly induced it to breach Wilcox's contract of employment. Certainly there is no hint that Beale had some private agenda—some benefit to himself, at odds with the interests of Niagara and its investors—that he sought to foster by terminating Wilcox.

That being so, the summary judgment in Beale's favor must be upheld even though Wilcox has a triable claim against Niagara. To that extent we affirm the district court.

### Conclusion

Because Judge Cummings' concurrence speaks to the flaws in the dissent at some length, only a word or two is in order on that score. We deal here with Wisconsin law. In our discharge of that task:

1. Although Niagara's lawyer may properly try to do so in closing argument to the jury on remand, we are not entitled to engage in a selective reformulation of the facts, as does the dissent's opening paragraph.

2. Nor are we entitled to ignore the language of the relevant Wisconsin statute in favor of a gloss that alters its basic thrust.

3. Finally, we are not entitled to substitute our own perceptions of the Wisconsin public policy exception for those of that state's Supreme Court—certainly not by espousing a narrower view that seems to be held only by a single Justice of that Court.

Under the principles of federalism dictated by *Erie v. Tompkins*, our job is at an end when we conclude (as we have) that the plain teaching of Wisconsin law commands recognition of the public policy exception invoked by Wilcox.[12]

Because it appears that Niagara's termination of Wilcox may have violated the public policy embodied in Section 103.02—a question that must be answered through trial and not on the pleadings—the order granting summary judgment in favor of Niagara is reversed and this case is remanded for further proceedings. But on Wilcox's own version of events he has no viable claim against Beale for tortious interference with contract, and the portion of the district court's order granting summary judgment in Beale's favor is affirmed.

CUMMINGS, Circuit Judge, concurring.

Although I fully concur in Judge Shadur's opinion, the dissent's mischaracterization of the facts, misstatement of the public policy at issue, and misapplication of Wisconsin precedent compels me to write a brief response.

The dissent implies that this case concerns a lazy employee who used a doctor's advice to "take it easy" as an excuse for a weekend off. It is striking how little this imagined scenario resembles the actual facts presented in the parties' stipulated joint appendix. According to those stipulated facts, the computer malfunction at Niagara occurred approximately nine months after Kenneth Wilcox, a thirteen-

---

12. In the totality of the dissent's refashioning of this action into what it is not, so as to preclude its submission to a fact finder on the merits, only one item requires brief mention because it is a potential jurisdictional-type challenge: the suggestion that Section 103.02 may be "no longer law at all, given the preemptive force of federal statutes." That notion really strains *National Solid Wastes Management Ass'n v. Killian*, 918 F.2d 671 (7th Cir.1990)—a decision about which our dissenting colleague is dubious indeed (*id.* at 685–88) and that is now *sub judice* before the Supreme Court—to the breaking point, if not beyond. Quite apart from the matters referred to in our dissenting colleague's "dubitante" opinion in *National Solid Wastes*, nothing suggests that a federal standard is in effect over the issue involved here so as to trigger any possible preemptive application of 29 U.S.C. § 667(a), a subject spoken to at greater length at n.* of the concurring opinion. But even if that were not so—even if Section 103.-02's statement were not enforceable as a statute, but were viewed only as a declaration of public policy by the elected representatives of the people of Wisconsin, the state legislature—it would require an even further stretch to foreclose the Wisconsin Supreme Court from shaping its tort law of employee rights against wrongful discharge in terms of that public policy consideration.

year at-will employee at Niagara, underwent double bypass open heart surgery. Wilcox worked long hours to repair the computer system, from 7:00 a.m. Thursday, March 30, 1989, until 2:00 or 3:00 a.m. on Friday, March 31, 1989, and then from 7:00 a.m. on Friday, March 31, 1989, until 9:30 that night. He left the paper mill at 9:30 p.m. after he began to experience angina pains. He was hospitalized overnight due to those pains and was released the next day with his cardiologist's orders to take it easy. He did so, even though his employer threatened to fire him if he did not work during the weekend. Certainly a jury could conclude from these facts that to work during that weekend would have been dangerous or prejudicial to Wilcox's life or health.

The dissent chides: "Where is Wisconsin's 'formally stated, fundamental and well-defined public policy' against long hours?" The dissent admonishes: "Nothing in weekend work is hazardous to an ordinary employee." The dissent misses the point. The Wisconsin statute at issue states that "No person may be employed or be permitted to work in any place of employment or at any employment for such period of time during any day, night or week, as is dangerous or prejudicial to *the person's* life, health, safety, or welfare (emphasis added)." Wis.Stat. § 103.02. As Judge Shadur aptly notes, this Wisconsin statute "reflects a legislative concern with the health and welfare of employees on an individual rather than a collective basis." The public policy evinced by § 103.02 does not prohibit "long hours" *per se*, but instead prohibits an employee from working during a time period that endangers his or her life or health.

The dissent arrives at the wrong result because it takes the wrong approach. The dissent inaccurately asserts that Judge Shadur's opinion reaches the conclusion that "all risk with 'some degree of substantiality' violates the law of Wisconsin." Rather Wisconsin law is violated when an employer terminates an employee for his or her refusal to work during a time that would be dangerous to that person's life or health. The caveat in Judge Shadur's opinion that the risk to the employee's health must be substantial rather than trivial stems from the statutory terms "dangerous" and "prejudicial."

The dissent states that § 103.02 is "not clear" because it has not been previously interpreted by a state court. Although this logic is dubious, if the dissent truly considered § 103.02 unclear, the appropriate response would be to urge certification of the question to the Wisconsin Supreme Court, rather than to disregard the statute as redundant to Wis.Stat. § 103.85.*

The dissent disregards not just the policy articulated in § 103.02, but Wisconsin's public policy exception to the employment at will doctrine altogether. It is precisely because "[w]e should take the Supreme Court of Wisconsin at its word" that a stingy application of Wisconsin's public policy exception is inappropriate. Yes, the Wisconsin cases contain much "restrictive language," but at least two of those cases nonetheless have held that the employer's discharge violated Wisconsin public policy. The dissent does not address those holdings. However, the dissent does peruse the holdings in which *no* wrongful dis-

---

* The dissent's additional suggestion, not raised by the parties' briefs, that § 103.02 "probably is no longer law at all, given the preemptive force of federal statutes," is unpersuasive. *National Solid Waste Ass'n v. Killian,* 918 F.2d 671, 679 (7th Cir.1990), can be misleading unless quoted in context. *"When an OSHA standard exists,* and the state has not submitted a section 18 plan, we undertake a two step inquiry. First, we determine whether the challenged state law or regulation constitutes, in a direct, clear, and substantial way, regulation of worker health and safety * * * Second, *we attempt to extricate from the state law or regulation* and invalidate those provisions that relate to worker health and safety in a direct, clear, and substantial way." *Id.* at 679 (emphasis added). This Court has not held that the "general duty clause" of 29 U.S.C. § 654(a)(1) is a "standard" that preempts state law. Such a holding would imperil numerous traditional areas of state general health and safety regulation and would seem to subvert 29 U.S.C. § 667(a). "Courts do not * * * lightly attribute to Congress or to a federal agency, the intent to preempt state or local laws," *id.* at 676, and such preemption would be extremely ill-advised.

charge was found, in order to conclude that "[g]eneral interests, * * * do not satisfy [the fundamental and well-defined] public policy requirement." But neither *Bushko v. Miller Brewing Co.*, 134 Wis.2d 136, 396 N.W.2d 167 (1986), nor *Schultz v. Production Stamping Corp.*, 148 Wis.2d 17, 434 N.W.2d 780 (1989), the cases cited by the dissent in support of its conclusion, asserts that broad public policies should be given less weight than narrow policy interests. The Wisconsin Supreme Court based its holdings in those cases on other grounds, as discussed in Judge Shadur's opinion.

When, by words or spirit, the state articulates a fundamental and well-defined public policy, Wisconsin courts have held that an employee may not be fired for his or her refusal to violate that policy. Wilcox has a valid claim that his employment was terminated on the basis of his refusal to obey a command that his employer was prohibited by statute from giving—a command which would have compelled Wilcox to work during a time period that was prejudicial to his life or health. Niagara wrongfully discharged Wilcox if it discharged him for refusing to work during a time period that would have been dangerous or prejudicial to his life, health, safety or welfare.

The dissent may think that the concern shared by Wisconsin citizens who serve as jurors, and those citizens' elected representatives—the Wisconsin legislature, for values other than "efficient production," is unwise. But only the members of the Wisconsin legislature, not members of this Court, can alter the legislation at issue. The dissent may think "concrete rules" more desirable than reference to the public policy articulated in state statutes. But we are a federal court sitting in diversity, with a difficult but limited task—to apply Wisconsin's doctrines and laws as a Wisconsin court would do. Even if a member of this Court would permit employers to fire at-will employees for any reason, without exception, the Wisconsin Supreme Court disagrees, and their view ends the matter.

EASTERBROOK, Circuit Judge, dissenting.

The computer controlling production at a paper mill crashes. While the system remains down, the manager responsible for its operation, told by his physician to "take it easy," takes the weekend off, and is fired. To say that this states a claim for wrongful discharge is to say that hard work contravenes the law of Wisconsin.

We should take the Supreme Court of Wisconsin at its word: a firm may sack an at-will employee "for good cause, for no cause, or even for cause morally wrong," *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 567, 335 N.W.2d 834, 837 (1983), unless the discharge "*clearly* contravenes the public welfare and *gravely* violates *paramount* requirements of public interest." 113 Wis.2d at 573, 335 N.W.2d at 840 (emphasis added). The cases defining limits on employers' choice overflow with such restrictive language. An employee has a claim only when "the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." *Ibid.* The policy in question must be "clear and compelling". 113 Wis.2d at 574, 335 N.W.2d at 841. The employee must identify a provision "evidencing a 'specific declaration' of this fundamental and well-defined public policy." *Wandry v. Bull's Eye Credit Union*, 129 Wis.2d 37, 42, 384 N.W.2d 325, 327 (1986). General interests, such as freedom to complain about violations of safety statutes or to refrain from participating in pension plans, do not satisfy this requirement. *Bushko v. Miller Brewing Co.*, 134 Wis.2d 136, 396 N.W.2d 167 (1986); *Schultz v. Production Stamping Corp.*, 148 Wis.2d 17, 434 N.W.2d 780 (1989). The most recent decision, *Winkelman v. Beloit Memorial Hospital*, 168 Wis.2d 12, 483 N.W.2d 211 (1992), restates the rule thus, at 215: "the employee's refusal to violate a formally stated, fundamental and well-defined public policy which has the effect of law" may not be a ground of discharge. *Winkelman* adds administrative regulations to statutes and constitutional provisions as sources of public policy but leaves the substance of the doctrine untouched.

Where is Wisconsin's "formally stated, fundamental and well-defined public poli-

cy" against long hours? How does it "gravely" violate the "paramount" requirements of the public interest to tell an employee to do sedentary work in a clean office? Wilcox points to a general safety law, Wis.Stat. § 103.02, that has been in force since 1867 without a single interpretation by a state court. This statute provides that "[n]o person may be employed or be permitted to work in any place of employment or at any employment for such period of time during any day, night or week, as is dangerous or prejudicial to the person's life, health, safety or welfare." Whatever this means, it is not clear, and it hardly supports my colleagues' conclusion that all risk with "some degree of substantiality" violates the law of Wisconsin. Risks are ubiquitous. Taxi drivers have collisions. Iron workers fall from their perches. Workers in battery plants inhale lead. See *UAW v. Johnson Controls, Inc.*, — U.S. —, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). Football players get thrown through the air and stomped on. If any substantial risk violates the law in Wisconsin, then Johnson Controls must close, and the Green Bay Packers will be sent packing.

Adjurations to safety do not create "well-defined" duties. That is why the Occupational Safety and Health Administration fills the Federal Register with regulations detailing permissible degrees of risk. It is not a violation of law to expose workers to lead, although it is a violation to expose them to more than 50 micrograms of lead per cubic meter of air. 43 Fed.Reg. 52952 (1978). Rules for coal mines, cotton dust, football helmets, and other dangerous places and things are similarly detailed. So far OSHA has thought it unnecessary to prescribe rules for stress that may cause heart trouble for desk-bound managers.

More, the language I have quoted from § 103.02, far from specifying "fundamental" norms, probably is no longer law at all, given the preemptive force of federal statutes. See *National Solid Wastes Management Ass'n v. Killian*, 918 F.2d 671 (7th Cir.1990), cert. granted under the name *Gade v. National Solid Wastes Management Ass'n*, — U.S. —, 112 S.Ct. 656,

116 L.Ed.2d 748 (1991). Although the parties do not discuss this obstacle, a court may notice on its own that it has been asked to apply nonexistent rules. *Kamen v. Kemper Financial Services, Inc.*, — U.S. —, —, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991); *Independent Insurance Agents of America, Inc. v. Clarke*, 955 F.2d 731, 733–34 (D.C.Cir.1992). The "general duty clause" of 29 U.S.C. § 654(a)(1), and 29 C.F.R. § 2200.35(c), providing for enforcement as if the statute were a regulation, cover the same ground as § 103.02. The Supreme Court may disagree with the holding of *National Solid Wastes Ass'n* that once a federal rule is in place no state may "in a direct, clear and substantial way, [regulate] worker health and safety." 918 F.2d at 679. While this court's view stands, however, Wisconsin's statute is of doubtful force. And because in Wisconsin constraints on the discharge of at-will employees depend on a statute or rule—a "formally stated, fundamental and well-defined public policy which has the effect of law"—the common law would not step in to replace the missing § 103.02.

The solitary clause sounding like a rule does not assist Wilcox. Wis.Stat. § 103.85 provides that an employee must be allowed "at least 24 consecutive hours of rest in every 7 consecutive days". It excepts cases of "breakdown of machinery or equipment ... requiring the immediate services of experienced and competent labor to prevent ... suspension of necessary operations". A "breakdown" at Niagara required Wilcox's "immediate services" to prevent a "suspension of necessary operations". My colleagues assert that "as matters turned out the exception did not apply: Wilcox did have the computer repaired (as he had promised) by the time that Niagara resumed production on Wednesday." 965 F.2d at 363 n. 11. This assumes that the exception is assessed *ex post*. The right perspective is *ex ante*, as things reasonably appear to the employer at the time it makes the demand. Niagara knew that Wilcox had failed to get the computer back in operation despite several days of work and was not required to accept his word that

two additional days would be enough. Balky computers respond more to inspiration (that is, to sleuthing the problem) than to raw hours of labor. The penalty comes *ex post*, no doubt, but the question for us is whether Niagara was entitled to make the demand that Wilcox show up over the weekend; if it was entitled to make the demand, it was entitled to penalize its worker's refusal to comply. An airline would have good cause to fire a mechanic who failed to repair a broken part on a Boeing 747, although the plane did not crash. Any employer is entitled to demand a margin of safety. At all events, Wilcox could have had 24 hours off and still complied with his employer's demand by working on Sunday. He chose not to.

Section 103.02 cannot sensibly be divorced from § 103.85 and read to forbid long hours. Executives are prone to heart attacks (rich food, sedentary work, and high stress are a deadly combination), ulcers, and other occupational diseases of the managerial class. Does this mean that in Wisconsin the executive suites must be emptied on weekends? Can there be a senior manager whose physician has not told him to "take it easy"? I cannot believe that these words, which after "Take two aspirin and call me in the morning" are the most common in medicine, authorize managers to rest up whenever crisis makes their skills most urgently needed.

Wilcox's real beef is not that repairing computers on weekends is unusually dangerous. It is that his heart condition requires kid-gloves treatment. If so, he was in the wrong job, and after leaving Niagara could take a less stressful one. Perhaps Wisconsin's handicap law, Wis.Stat. § 111.-34, requires accommodation of persons such as Wilcox, but he abjured any relief it offers. We disserve a *real* public policy of Wisconsin—one requiring resort to administrative remedies as a prerequisite to litigation about handicap discrimination—in allowing Wilcox to treat § 103.02 as if it required accommodation of abnormal medical conditions.

Requiring an employee to show "fundamental" and "well-defined" policy with "paramount" requirements prevents the evasion of the concrete rules, such as § 103.85 and the handicap-discrimination regimen, by reference to open-ended statutes such as § 103.02. Nothing in weekend work is hazardous to an ordinary employee, and Wilcox has by-passed the administrative remedies essential to an argument that his heart condition required accommodation. Generic claims such as "they exposed me to unreasonable risk" are easy to make, costly to defend, and all but impossible to resolve short of a jury trial. They create in operation the good-faith rule that *Brockmeyer* expressly rejected. 113 Wis.2d at 569–70, 335 N.W.2d at 838. The costs of such litigation, and the inevitable errors in application (juries may not share the firm's concern with efficient production and sometimes let sympathy get the better of them), lead to the same pathology that infests civil service systems. Employers keep inadequate workers around and tolerate their lower productivity, because it is so expensive and risky to realign the match between persons and jobs.