Lynne ALBER, et al., Plaintiffs,

v.

**ILLINOIS DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES, et al., Defendants.**

No. 90 C 6576.

United States District Court, N.D. Illinois, E.D.

March 18, 1993.

Roger B. Derstine, Chicago, IL, for plaintiffs.

Gerald L. Maatman, Jr., William Lynch Schaller, Andrew J. Boling, Baker & McKenzie, Richard F. Linden, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This Court's March 3, 1992 memorandum opinion and order (the "Opinion," 786 F.Supp. 1340 [1]), based on its holding that a married couple and its retarded adult children (collectively "Albers," while each is referred to here individually by his or her first name) could constitute a "family" within the constitutional meaning of that term, addressed claims by that non-biological family that defendants had sought to break them apart for purely vengeful reasons. In accordance with Fed.R.Civ.P. ("Rule") 12(b)(6) principles, the Opinion accepted Albers' factual allegations as true (a requirement that the Supreme Court itself has again reconfirmed two weeks ago in *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, —— U.S. ——, 113 S.Ct. 1160, 122

---

[1] This opinion will assume familiarity with the Opinion, which will be cited here as "Opinion at ——," setting out the F.Supp. page number but omitting any repetition of the volume number. Despite that assumed level of familiarity, this opinion will repeat the definitions of the various defined terms there, in order that this opinion may stand as much as possible as a self-contained unit.

L.Ed.2d 517 (U.S.1993))—and on that basis, this Court's exhaustive (and exhausting) analysis allowed Albers' 42 U.S.C. § 1983 ("Section 1983") claims to survive a motion to dismiss their original Complaint that had been filed by Protection & Advocacy, Inc., its director Zena Naiditch and its employee Michael Richardson (collectively "P & A Defendants" and individually "P & A," "Naiditch" and "Richardson").

Since then the parties have tendered another raft of contentious filings, including Albers' Second Amended Complaint ("SAC") and the full briefing of motions for summary judgment filed under Rule 56 by all of the present defendants: not only P & A Defendants but also Illinois Department of Mental Health and Developmental Disabilities, its director Jess McDonald and its employees Glenn Grzonka, Reginald Richardson and Ralph Travis (collectively "Department Defendants" and individually "Department," "McDonald," "Grzonka," "Reginald Richardson" and "Travis"). Although those motions also raise a number of other issues to a greater or lesser extent, they focus chiefly on defendants' claimed entitlement to qualified immunity on the Section 1983 claims—a shield that this Court had made clear would protect defendants unless Albers could provide specific evidence tending to show that defendants' allegations of child abuse and neglect were fabricated (see Opinion at 1363 n. 30). Now Rule 12(b)(6)'s protective curtain has itself dropped away and the actual evidence has come into view instead. For the reasons stated in this memorandum opinion and order—not on qualified immunity grounds but on an even more basic principle—all defendants' motions for summary judgment are granted.

### Background

■ This case presents in dramatic focus the sharp difference between the premises underlying a motion targeting plaintiffs' pleading under Rule 12(b)(6) and those underlying a motion under Rule 56, whose goal is to avoid trial because of the absence of any material factual dispute. In the former situation the need to take plaintiffs at their word also calls for drawing all reasonable inferences from their well-pleaded allegations in their favor (*Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992)). But once Rule 56 is called into play, the pleading allegations themselves fall away (Rule 56(e)) in favor of the parties' factual submissions.

■ To be sure, the Rule 56 movant assumes the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)), but that does not render Rule 56 an ineffective means of disposing of factually infirm cases. As this Court, writing for our Court of Appeals in *Wilcox v. Niagara of Wisconsin Paper Corp.,* 965 F.2d 355, 356 (7th Cir.1992) (citations omitted), has pointed out:

> [I]t has taken a recent trilogy of Supreme Court decisions to give a major boost to the Rule's utility as a vehicle for the final disposition of lawsuits without the need for an evidentiary hearing.

■ For Rule 56 purposes a "genuine" issue does not exist unless record evidence would permit a reasonable factfinder to adopt the nonmovant's view (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and only facts that would prove outcome-determinative under the substantive law are "material" (*Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)). In those respects this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991)).

■ Those principles, combined with Albers' total failure to dispute defendants' factual submissions, have painted Albers into a legal corner. This District Court's General Rule ("GR") 12(m) requires Rule 56 movants to submit a statement of assertedly uncontested facts, with citations to the record in support of each factual statement. Then GR 12(n) requires nonmovants to respond point by point, with citations to the record in support of (1) any claimed dispute concerning movants' version of the facts and (2) any additional facts that nonmovants choose to assert. Here Albers' numerous ad hominem attacks against defendants in Albers' Rule 56 briefing cannot substitute for their total fail-

ure to have filed a GR 12(n) statement. This Court therefore accepts defendants' GR 12(m) statements as uncontested (*Wienco, Inc. v. Katahn Assoc., Inc.,* 965 F.2d 565, 566–68 (7th Cir.1992) and cases cited there).[2] And those statements have created a stark contrast with the earlier picture of heartless bureaucrats harassing the humanitarian efforts of surrogate parents—the picture that this Court had been required to accept as gospel in writing the Opinion.

### Facts

This opinion will not recount the full chronicle of events that led to this litigation—instead the Opinion will be relied on for that purpose. But that is done only for general reference purposes, for (as already stated) Albers' allegations in their SAC are not to be credited as evidence for Rule 56 purposes. Accordingly this opinion turns to the facts established by defendants' uncontroverted GR 12(m) statements and supporting evidentiary materials.

What follows as to SAC Count I is a brief look at the 1988[3] seizure of Ron, Cameron and Tracy[4] from the Union Grove School and the ensuing acts on which Albers seek to base defendants' liability. To begin with, in late March Richardson received a complaint from Renee Herridge ("Herridge"), a teacher's aide at Union Grove School, that Tracy, Ron and Cameron were being neglected. More specifically she reported that they were perpetually hungry and wore ill-fitting clothes.[5]

Responding to that complaint, Richardson attempted to call but was unable to reach Lynne, whom he believed to be the guardian for Ron, Cameron and Tracy. Then on April 4 he made an unannounced visit to Albers' residence. Although he heard the television no one answered the door, so he left a P & A brochure and his business card to enable Albers to call him. Soon thereafter he did speak on the telephone with Lynne, who acknowledged having received the card. Lynne told him that she was the state-approved guardian for all three young people, and the two then discussed dates on which Richardson could visit with her and them.

Lynne, Tracy, Ron and Cameron met with Richardson in Albers' living room on Thursday, April 14. During that visit Richardson was struck by Cameron's gaunt appearance, leading him to believe that Cameron might be suffering from malnutrition.

Herridge called Richardson about a week later to tell him that each of the Albers children[6] had dried feces on his or her feet. So on Friday, April 22 Richardson visited the school to review the students' records and to interview the teacher, school nurse and principal. What he learned—even in a light favorable to Albers—is nothing short of shocking. School personnel reported that Cameron indeed had feces on his feet and that it had been there the previous day. Moreover, the nature of his condition was far from unique: All three students had histories of poor hygiene and of coming to school with dried feces on their bodies. Each school official stated to Richardson that Cameron was suffering from malnutrition and maintained that each of the children should be removed from the Alber home.[7]

On leaving the school Richardson returned to the Albers' residence. Herman answered

---

**2.** P & A Defendants' GR 12(m) statement will be cited "P & A 12(m) ¶ —," while Department Defendants' GR 12(m) statement will be cited "D. 12(m) ¶ —."

**3.** All dates referred to in this opinion occurred in 1988 unless otherwise indicated.

**4.** Though Albers' claims concern Ron and Cameron and not Tracy, this opinion will include her as well where clarity so requires.

**5.** Both in that complaint and in a conversation that she had with Richardson on April 7, 1988, Herridge also related comments from other teachers that the conditions had existed for years.

**6.** As in the Opinion, this Court refers to each of the young people as "children" irrespective of whether or not they had yet reached the age of majority.

**7.** Richardson, who was told that Cameron would experience weight loss during school vacations and holidays, examined records that (1) suggested that Cameron's weight fluctuations corresponded to the availability of school meals and (2) reflected that Cameron frequently received double lunches. Richardson also learned from the principal that during summer school events the Alber children would bring lunches from home consisting of an uncooked hot dog and a stale slice of bread.

the door and told Richardson that Tracy, Ron and Cameron were Mrs. Albers' and not Herman's responsibility, and he refused either to discuss the allegations of neglect or to allow Richardson to see the children.

Richardson then trekked to the Whiteside County Courthouse, where he learned that contrary to what Lynne had said, Lynne and Herman were not the children's guardians. From the courthouse Richardson drove to the Sinnissippi Mental Health Center ("Sinnissippi")[8] to meet with Joyce Peterson ("Peterson"), its developmentally disabled case coordination supervisor. Peterson told him that a prior file existed on Tracy. She also offered to call Department for guidance on placement options.

On returning to P & A's office Richardson called his managing attorney, P & A employee Carol Bell ("Bell"), to review the emerging facts of the Alber case. Bell, who said she would be out of town during the following week, suggested that Richardson work with Department to secure alternative placement should the three students desire to move. Richardson understood Bell as instructing him to use his best judgment and to take any steps necessary to implement the course of action that was to be worked out with the Alber children and Department.

Richardson received a phone call from Department's C.J. Sizemore ("Sizemore") on April 26. Sizemore, who had spoken with Sinnissippi's case coordination personnel, told Richardson that as a result of conditions in the Alber home Department had revoked the Alber license in January 1984, and that De-partment was unaware that Tracy, Ron and Cameron were still living with Lynne and Herman. Sizemore recommended to Rich-ardson that emergency placement options be made available.

After Department had made the necessary arrangements for "evaluation and rest place-ment" at the Village Inn at Dixon,[9] Richard-son returned to the Union Grove School on April 28. There he met in the principal's office with Tracy, Ron and Cameron. Their teacher was present, and all were near enough to the school nurse so that she could hear the conversations. Richardson raised with each the possibility of leaving the Alber residence, and their responses made him be-lieve that they sought a new home.[10] Rich-ardson took the students for medical and psychological evaluations and then on to Vil-lage Inn,[11] where they remained until June 28 (as to Cameron) and July 15 (as to Ron), when each was returned to the custody of Lynne and Herman (see Opinion at 1349). Though SAC Count II is purportedly based on the stay at Village Inn, it does not make clear just what is complained about in that respect.

Accordingly this opinion turns to the claims in Count III (Reginald Richardson's later taking of Ron and Cameron from the Alber home) and Count IV (the boys' later stay at Department's Lincoln Development Center ["Lincoln"] residential facility[12]). In August Whiteside County's State's Attorney filed a complaint for a temporary restraining order, charging Lynne and Herman with op-erating an unlicensed community residential center.[13] On August 29 the Circuit Court of

---

8. Sinnissippi, which is non-profit, provides out-patient mental health services to the residents of Illinois' Whiteside and Lee Counties.

9. Village Inn is a state-licensed privately-admin-istered residential facility for the developmentally disabled.

10. Tracy apparently was the most vocal of the three and consented eagerly. Ron was less lucid (P & A 12(m) ¶ 31):

> When questioned he repeated the word move and vigorously nodded his head.

Cameron was the most difficult of the three to understand (id.):

> The teacher was needed to communicate with Cameron. When the teacher presented Cam-eron with the choice to move he smiled and clapped his hands.

11. One factor critical to Richardson's decision to move Tracy, Ron and Cameron was that no guardian had been appointed for them. If there had been a guardian to attend to their welfare, "he would have contacted his managing attorney who would in turn file an action in the state probate court to address the situation of each disabled adult with a legal guardian" (P & A 12(m) ¶ 39).

12. Lincoln is designed for developmentally dis-abled individuals and offers them a wide range of programs, activities and services (D. 12(m) ¶ 39).

13. Michael Richardson had not communicated with anyone at the Illinois Department of Public Health to complain about the condition at the Alber home. Nor did he complain to that agency

Whiteside County, which found in part that there were "rights of the developmentally disabled in need of protection," ordered inspection and monitoring of the Alber residence (P & A 12(m) ¶ 44).[14]

Sue Rentsch ("Rentsch") and Reginald Richardson were assigned to investigate the Alber home and to determine whether it was an unlicensed community residential alternative. At the end of August, before she visited the residence, Rentsch went to the Merrill School, where Ron then attended classes. Rentsch spoke to a school official, who reported that Ron came to school in ill-fitting clothes that were not climate-appropriate and that Ron had brought moldy frankfurters to school for lunch. That official also told Rentsch that she had observed human feces between Ron's toes and on his feet.

At about the same time Rentsch and Reginald Richardson visited and inspected the Alber residence. As D. GR 12(m) ¶¶ 18–26 (record references omitted) explain, what they found has to be described as appalling (perhaps a masterpiece of understatement):

18. On or about August 30, 1988, Sue Rentsch and Reginald Richardson visited and inspected the Albers home. The conditions of the Albers home were deplorable and unsanitary. The Albers home was roach infested. Ms. Rentsch and Mr. Richardson observed roaches and other insects throughout the house. Sue Rentsch observed cockroaches inside a drinking glass. They also observed mouse traps and rat poison inside the home which caused Ms. Rentsch and Mr. Richardson to believe that there were rodents inside the Albers home.

19. During their visit, Sue Rentsch and Reginald Richardson observed Ronald Reichard and Cameron Franklin. Ronald Reichard and Cameron Franklin appeared unhealthy. Ronald and Cameron were very thin and appeared malnourished.[15] Ronald and Cameron were pale and lacked personal hygiene.

20. The Albers home was extremely dirty. Several rooms were exposed to dirt and were without floor covering in certain areas. There was dirt throughout the home.

21. Windows of the Albers home were boarded up. The windows upstairs could not be opened. The upstairs windows were either nailed shut or boarded.

22. There were not enough beds for Ronald, Cameron and Josh who resided in the Albers home. Sue Rentsch observed stained urine mattresses with a strong smell of urine. There was a strong odor of urine throughout the home. Lynne Alber stated that two of the residents slept together on one of the urine stained mattresses. There was also what appeared to be a urine stained couch or bed in one of the hallways of the home.

23. The stairway leading to the upstairs was dangerous. The stairs were steep, narrow, rickety and without hand rails.

24. The Albers kitchen was filthy and unsanitary. There were cleaning supplies stored next to food. The stove was broken and extremely dirty. There were insecticide and ketchup on the counter. There were toxics including rat poison and toxic cleaning supplies stored underneath the sink which were readily accessible to the three disabled residents. The kitchen cabinets were missing doors. There was a single picnic table in the kitchen. The picnic table, kitchen counters and other areas of the kitchen were filthy.

25. The Albers home was cluttered with debris. It was extremely difficult to walk inside the Albers house without tripping over some object or thing because of the debris. There were gaps in the downstairs floor; cracks in walls and ceilings; peeling wallpaper or paint; warped, broken, loose and cracked floor covering; loose handrails; broken window panes and

---

or any other organization that the Alber residence was an unlicensed nursing home (P & A 12(m) ¶ 42).

14. However, the court balanced the possible harm that removal could cause to developmen-

tally disabled individuals and denied the injunction.

15. [Footnote by this Court] Medical records reveal that Cameron weighed only 62 pounds on his admission to Lincoln.

other similar hazards on both the interior and exterior of the home.

26. Sue Rentsch and Reginald Richardson observed outside locks on the two bedrooms in which Lynne Alber claimed the three disabled individuals slept. This indicated a possibility that the disabled adults may have been locked inside their bedrooms.[16]

Based on their experience and training, both Rentsch and Reginald Richardson concluded that the Alber residence was an illegally operated "community residential alternative" (as defined in Ill.Rev.Stat. ch. 91½, ¶ 623(4)).[17] Each believed that Ron's and Cameron's physical and mental well-being were in danger at that time. And each thought that an emergency situation existed requiring the removal of Ron and Cameron from the Alber home. Accordingly an order of closure was issued, and on September 2 Reginald Richardson signed an application for administrative admission for Ron and Cameron (Code ¶ 4–311.) William Murphy, then Department's acting Director, authorized Reginald Richardson to sign the application. On that same September 2 date Ron and Cameron were admitted to Lincoln.

### Defendants' Section 1983 Liability

All of Albers' Section 1983 claims, though based on different portions of the facts and different constitutional provisions,[18] are closely linked. As Opinion at 1363 n. 30 and the earlier affirmance of another of this Court's opinions in *Landstrom v. Illinois Dept. of Children & Family Serv.*, 892 F.2d 670, 674–78 (7th Cir.1990) reflect, roughly the same analysis governs each (the following quotation is taken from the still earlier opinion in *Darryl H. v. Coler*, 801 F.2d 893, 901 n. 7 (7th Cir.1986) (citation omitted)):

> Fourteenth amendment due process analysis obviously differs in some respects from fourth amendment analysis. However, for present purposes, we believe both interests can be treated together. Whether substantive due process rights are at stake, or procedural due process rights are at stake, a court must essentially weigh the privacy interest of the family member against the interests of the government. The same basic analysis is utilized under the fourth amendment.

Albers—though they meander from time to time into due process analysis—primarily frame their arguments in terms of the Fourth Amendment.[19] This Court too will speak in terms of the Fourth Amendment, though it is equally true that Albers cannot point to any other source of clearly established constitutional rights whose violation by a state actor would trigger Section 1983 liability (*Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981)). In that respect defendants state accurately (as presaged by Opinion at 1363 & n. 30) that any governmental actor would be entitled to qualified immunity if the undisputed evidence showed that the actor had responded reasonably to plausible allegations of neglect and child abuse.

■ That could represent the application to the circumstances of this case of the general doctrine that qualified immunity shields state actors from both suit and liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would

---

**16.** [Footnote by this Court] Even allowing Lynne and Herman the inferences to which they are entitled on summary judgment, the apprehension that the disabled children were being locked in their rooms, as though they were caged animals, was scarcely unreasonable.

**17.** That provision is part of the Mental Health Code, citations to which will take the form "Code ¶ —." Although the new Illinois statutory numbering system has become effective January 1, 1993, this opinion will retain the prior citation form (as the Illinois Supreme Court permits).

**18.** This opinion follows the prevalent and convenient (though technically inaccurate) practice of referring to the underlying Bill of Rights provisions (which of course impose limitations only on the federal government), rather than solely to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Right guaranties).

**19.** This is how Albers' current Mem. 11 sets forth its topic heading on qualified immunity:

> The wrongful and continued detention of Ron and Cameron violated the clearly established right to be free from unlawful seizure resulting in a deprivation of liberty without due process of law and in violation of the Albers' constitutional right to family integrity.

have known (*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) has provided the definitive explanation of that "clearly established" concept:

> It should not be surprising ... that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

But all that is really beside the mark: Even though both sets of defendants frame their arguments in qualified immunity terms, in this instance the inquiry need never reach that stage as to any defendant, for Albers fail to demonstrate *any* constitutional violation by any defendant in any event.

### 1. *P & A Defendants*

P & A Defendants advance a number of alternative reasons [20] for averting Section 1983 liability. At the outset they urge, based on principles set forth in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), that they are not state actors to begin with. Any excursion down that path would implicate such questions as whether, even if they are not, they would still remain vulnerable under Section 1983 because of their linkage with state actors. And if that fork in the road were taken, it would demand an inquiry into the effect of *Wyatt v. Cole,* —— U.S. ——, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) on P & A Defendants'

ability to wrap themselves in the mantle of qualified immunity.

But all those trips and side trips may be avoided in light of Albers' basic substantive failure. Though it takes some background explanation to set the stage for the analysis, the conclusion is inevitable once that background is in place.

■ There is no question here that Ron and Cameron suffered a "seizure" within the meaning of the Fourth Amendment if they did not consent to their initial removal from the Alber home by P & A Defendants. In cases such as this parents and other caretakers have legitimate expectations "that their familial relationship will not be subject to unwarranted state intrusion" (*Darryl H.,* 801 F.2d at 901).

To be sure, P & A Defendants contend that no seizure occurred in the Fourth Amendment sense because Ron and Cameron gave Richardson their consent to being taken from Union Grove School. But that argument must be rejected, because even P & A Defendants' version of the facts reveals less than a clear-cut case of consent. Ron did no more than to repeat the word "move" and nod his head, and Cameron simply smiled and clapped his hands. Neither's actions plainly reveal the requisite understanding by a severely developmentally disabled individual of the choice that they were being asked to make. Thus even on the assumption (not established on the current record) that such an individual is able to provide consent on such matters, the inferences to which Albers are entitled would defeat summary judgment on the consent issue.

■ But the Fourth Amendment prohibits *unreasonable* seizures, not *all* seizures— "The touchstone of the fourth amendment is reasonableness" (*Snell v. Tunnell,* 920 F.2d 673, 697 (10th Cir.1990)).[21] And even though

---

**20.** They maintain, for example, that this Court should reject some of Albers' Section 1983 claims as based on an impermissible theory of respondeat superior. Though that argument may well have some merit, at least as to Naiditch, it is unnecessary to reach it.

**21.** Relatedly, such cases as *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) illustrate that the substantive Due Process Clause as well as the

First and Fourteenth Amendments protect the integrity of families from intrusion in much the same way as does the Fourth Amendment. But such cases as *Landstrom* and *Hameetman v. City of Chicago,* 776 F.2d 636, 642–43 (7th Cir.1985) make it equally clear that those rights too are not absolute and that Section 1983 liability does not vest merely because state action interferes with family association. Again the interference must be unreasonable to be actionable.

that determination "requires a balancing of the need for the particular [seizure] against the invasion of personal rights that the [seizure] entails" (*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979)[22]), both *Darryl H.*, 801 F.2d at 902 and *Landstrom*, 892 F.2d at 676 stress "the 'extraordinarily weighty' interest of the state in child abuse investigations" (*id.*). It was for that reason that Opinion, 786 F.Supp. at 1363 made it clear that on a "Fourth Amendment claim in this context [a plaintiff] must introduce 'specific evidence tending to show that the allegations of child abuse were fabricated and that the defendants knew that such allegations were untrue.'" In the absence of any such suggestion, the plain bona fides of the official action make the assumed seizures reasonable as a matter of law for purposes of Fourth Amendment (and all other constitutional) analysis.

■ On that score Albers have produced nothing to suggest, even with the benefit of favorable inferences, that P & A Defendants acted improperly, let alone unreasonably. To the contrary, the uncontroverted record shows that Richardson reacted properly to substantial evidence that developmentally disabled adults who had no court-appointed guardian were living in an unlicensed—and hazardous—Community Residential Alternative. In response to his being told that Ron, Cameron and Tracy were being abused—information coming from a credible school official—Richardson conducted an extensive investigation that included personal meetings with school officials, the developmentally disabled individuals themselves and Lynne and Herman. Moreover, Richardson checked public records to determine guardianship (records that demonstrated that Lynne had misrepresented her own status) and discussed the case with his supervisor Carol Bell. It was only after he took those actions that Richardson arranged for the removal of Ron, Cameron and Tracy from the Alber residence. Accordingly, all of Albers' claims against P & A Defendants must and do fail.

Only a moment or two need be spent on Albers' weightless arguments to the contrary. They point to procedural safeguards to which they say "Ron and Cameron had a clearly established due process right." But they identify nothing in Illinois law that creates an entitlement infringed by P & A Defendants. Nor are they persuasive in contending (1) that the absence of any emergency demanded the provision of pre-deprivation procedural safeguards or (2) that Richardson was motivated by malice rather than by responsibility.

On the first of those points, Lynne and Herman say not a word to challenge the evidence as to the deplorable conditions of their home and of the young people committed to their charge. Instead they advance the astonishing position that Richardson would have acted more quickly had the situation been as grave as P & A Defendants now suggest. But that kind of attenuated inference flies in the face of the uncontradicted evidence of terrible conditions that no one—especially developmentally disabled individuals who cannot protect themselves—can be forced to endure.

Albers' other argument—that in which they impute personal malice to Richardson as his motive for acting—is equally insupportable. Nothing in the uncontested facts justifies their irresponsible suggestions that Richardson at first "had a single motive, to interfere with the Albers' right of family association" and later wanted to get even with them for having Ron and Cameron returned to them.

**2.  Department Defendants**

Like P & A Defendants, Department Defendants also submit alternative arguments to defeat Albers' claims. They first claim entitlement to qualified immunity (an issue as to which they do not face the already-referred-to problems that might confront P & A Defendants), and then they argue as a fallback position that the Eleventh Amendment bar Albers' suit. Because Albers again strike out on demonstrating *any* violation of constitutional rights, the absence of a viola-

22. *Bell* was actually speaking of Fourth Amendment searches rather than seizures. But although those concepts are not to be equated for all purposes (*Soldal v. Cook County*, — U.S. ——, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992)), the just-quoted language applies to each with equal force.

tion of "clearly established" rights (the qualified immunity standard) follows a fortiori. And that also means that there is no need for this opinion to address the fallback Eleventh Amendment argument.

Again on the uncontested facts, the situation that Department confronted at the Alber home clearly establishes the reasonableness of each of Department Defendants' acts as a matter of law. On August 30, the same day on which they inspected the Albers' residence, Rentsch and Reginald Richardson interviewed a school official familiar with Ron and Cameron. From that official they learned that the children were neither clean nor properly fed (again an understatement). And the home visit by Rentsch and Reginald Richardson fully corroborated the allegations of improper care. They saw disgraceful and dangerous home conditions, including strewn debris, filth, unsanitary maintenance of food and of course the locks on the outside of bedroom doors. That visit also confirmed that both Ronald and Cameron appeared— once more to say the least—unhealthy and dirty.

Moreover, before it issued its order of closure Department had obtained a Department of Public Health report detailing that agency's inspection of the Alber home. Nurses who had conducted that examination found deplorable and unsanitary conditions, including human feces on the toilet (D. 12(m) ¶¶ 10–12).

Here again Albers blithely ignore the evidence, pointing instead to statutory procedures that they claim Department failed to follow. And once again that argument miss-

es the mark. There is no question that the Code authorized Department's withdrawal of Ron and Cameron from the Alber home. Department Defendants had concluded that the residence qualified as a community residential alternative under Code ¶ 623(4) [23] but that it was improperly maintained and unlicensed. And Code ¶ 633 expressly provides for the removal of disabled residents when grounds for immediate closure exist:

> Any situation that exists at a community residential alternative which may result in serious mental, psychological or physical harm to residents shall be abated or eliminated immediately. If the Department determines that such a situation exists and that proper measures to remedy the situation are not being taken, it shall immediately issue an order of closure and withdraw the residents and place them in another residential setting prior to a hearing.

On all the evidence, Department acted properly in the light of exigent circumstances. Department Defendants' seizure of Ron and Cameron was indisputably justified, and it was no greater in reach than was necessary to effectuate the state's legitimate interest in caring for Ron and Cameron.[24]

### Conclusion

There is no genuine issue of material fact as to any of Albers' Section 1983 claims, and all defendants are entitled to a judgment as a matter of law on all those claims. This action is dismissed with prejudice.[25] And it should be understood that this dismissal is intended as a final order—the possibility that

---

**23.** In relevant part that definition states:

> "Community residential alternative" means a group home for 8 or fewer developmentally disabled adults who are unable to live independently but are capable of community living if provided with an appropriate level of supervision, assistance and support services.

**24.** Nor have Albers provided any basis to support their argument that Ron's and Cameron's stay at Lincoln violated a constitutional right. Quite to the contrary, the uncontested facts demonstrate that Ron's and Cameron's conditions improved on their admission to Lincoln.

**25.** Although it is certainly not apparent from the SAC (which reads as though all of Albers' claims

are federally grounded, with the only relief sought being tied to federal law), Albers' responsive memorandum suggests an intention to advance state statutory and common law claims. If Albers believe that they have viable claims of that nature that will survive the adverse determinations here on an issue preclusion basis, they will be required to file in this Court's chambers a timely motion under Rule 59(e), coupled with a brief memorandum explaining the nature of such state law claims. If that were to be done, this Court would then consider whether to grant the Rule 59(e) motion to the extent necessary to convert this with-prejudice dismissal into one without prejudice solely as to such claims, as is permitted under *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

is spoken of in n. 25 is only that, and is not to be viewed as an order granting leave to reinstate or as any other form of order that would deprive this opinion of its finality as a fully dispositive order terminating this litigation.